*In re* N. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. M.N., Sr., *et al.*, Respondents-Appellants).

Second District    No. 2—98—1430

Opinion filed December 10, 1999.

Josette Skelnik, of Law Offices of Josette Skelnik, of Elgin, for appellants.

David R. Akemann, State's Attorney, of St. Charles (Martin P. Moltz and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GALASSO delivered the opinion of the court:

Respondents, M.N. and F.N. (hereinafter M.N. and F.N.), appeal from the order of the circuit court of Kane County finding their eight children to be neglected and making their youngest child, I., a ward of the court. On appeal respondents raise three issues, namely, (1) whether the trial court's finding that I. was a neglected minor was

against the manifest weight of the evidence and whether its order adjudicating him neglected and making him a ward of the court must be reversed; (2) whether the trial court erred in finding that respondents' seven other children were neglected; and (3) whether the trial court improperly considered a fitness evaluation of M.N. in an unrelated case, where there was no showing that M.N. ever gave his informed written consent to the release of the evaluation.

On April 21, 1998, the State filed a three-count petition for adjudication (petition) against respondents, alleging their eight children were neglected minors. The children's names and birth months are as follows: M., Jr., May of 1982; J., July of 1983; N., February of 1985; C., July of 1988; Jo., October of 1989; M., August of 1991; T., October of 1993; and I., January of 1998.

The petition alleged in pertinent part:

"3. The minors are neglected minors by reason of the following:

1. That said minors *** are neglected minors under 18 years of age and their parents, who are responsible for their welfare, do not provide the proper or necessary support, education as required by law, or medical or other remedial care recognized under the State law as necessary for the minor's [sic] well-being *** to wit: I. N. was born premature, after suffering inter cranial [sic] bleeding and also [has] an inguinal hernia, and the parents are refusing to follow up with the recommended treatment plan; thereby placing the minor at risk.

\* \* \*

3. That [the minor children's] *** environment is injurious to their welfare; to wit: the parents do not provide adequate housing for the minors in that they reside in *** one room [in a motel], which places the minors at risk of harm."

At the end of the shelter care hearing held on April 21, 1998, the trial court found probable cause to believe that the minors were neglected as alleged in paragraph 3.1 of the petition. However, the trial court found that an immediate and urgent necessity did not exist to remove the minors from their home. Further, the trial court directed that I., who had been taken into protective custody prior to April 21, be returned to respondents. The trial court entered an order of protection regarding all minors, which required respondents, among other things, to follow the medical discharge recommendations for I. and to take I. to all recommended follow-up examinations.

An adjudicatory hearing began on August 24, 1998, with respondents appearing *pro se*. Dr. Diane Nielsen, a pediatrician, testified first for the State. She stated that other physicians in her practice group had treated the N. children and that she had personally treated two of them, I. and M. Sometime in February, 1998, Dr. Kopparthi, a neona-

talist who had attended I.'s birth and had treated him in the following weeks at Copley Hospital, asked Dr. Nielsen to see the infant a week after his discharge from the hospital.

Dr. Nielsen's review of I.'s hospital records indicated the following. I. was born prematurely on January 15, 1998. A routine ultrasound procedure showed that I. had suffered an intercerebral hemorrhagic infarct, the equivalent of a stroke, prior to his birth. Because of I.'s prematurity, there was also a concern that he could have problems with his eyesight. Dr. Nielsen stated that an evaluation was necessary to determine if I.'s eyes were developing normally.

Dr. Nielsen testified that on February 25, 1998, respondents brought I. to Dr. Nielsen's office, stating that their son was there to be circumcised. Dr. Nielsen testified that her examination of the infant revealed that he had the appearance of a normal newborn. His weight gain since discharge from the hospital was appropriate. Dr. Nielsen observed a hernia, which had not been noted before. Despite the hernia, I. appeared to be fine. At the conclusion of this examination, Dr. Nielsen gave respondents the following recommendations: (1) a follow-up eye examination to determine if I.'s eyes were developing properly; (2) a follow-up examination by a neurologist regarding any effects of the intercerebral bleeding; (3) an examination by a developmental pediatrician to determine if there were "early and subtle findings" that could be indicative of developmental delay; and (4) the appropriate vaccinations and physical therapy for I. Dr. Nielsen noted that, at the time of this examination, respondents had already missed an appointment with an opthalmologist, which had been recommended upon I.'s discharge from the hospital.

According to Dr. Nielsen, babies with a history of intercerebral bleeding are at "high risk for many neurological problems." The area of the brain in which the bleeding had occurred "would be susceptible to not developing correctly." Dr. Nielsen further stated:

> "If you initiate therapy early, the brain is very what we call plastic. *** It has the ability to recover from previous injuries at a young age in that if you begin therapy [and] begin working on the developmental skills, motor skills, social skills, *** you can take advantage of an early brain that is going to have a chance to have better development."

Dr. Nielsen also told respondents that they would have to keep close track of I.'s hernia and that, if it became strangulated, i.e., if part of the intestine became stuck in the hernia, then the baby would need immediate treatment. Dr. Nielsen indicated that many hernias in newborns resolve themselves in four to six months.

Dr. Nielsen stated that the follow-up care for I. that she outlined

for respondents was necessary for his well-being. However, these directions were met with "extreme resistance," and M.N. indicated to her that he had no desire to follow them.

Regarding the children's immunizations, Dr. Nielsen testified that the children had not received them "according to schedule." I. had been given a DPT, polio, and Hepatitis B vaccination but had not yet received a Hemophilus influenza type B (HIB) vaccination. Dr. Nielsen further stated that she examined another of respondent's children, M., who had come to her for a school physical. During that examination, Dr. Nielsen observed that M. had a "lazy eye." She told M.N. about the need for treatment of this condition. M.N. responded to her that "[h]e didn't believe in eye doctors and [he] could take care of this problem at home." She testified that if a "lazy eye" was not treated, poor vision in the affected eye was a probable result.

On cross-examination, Dr. Nielsen agreed that her concerns regarding I. were primarily based on his being born prematurely and having suffered intercerebral bleeding before his birth rather than on what she observed during the February 25, 1998, examination. She did not recall any religious issues being raised by respondents prior to or during that examination. Further, she stated that respondents did not bring I. to an examination that had been scheduled for April 22, 1998. Dr. Nielsen stated that she was unaware that, prior to this second examination, respondents had decided that she was no longer the family's pediatrician. Dr. Nielsen agreed that she had told F.N. during a telephone conversation in the latter part of February 1998 that, if respondents did not bring I. in for follow-up examinations, then she would contact the Department of Children and Family Services (DCFS).

The State's next witness, Jerry Waite, was a child protective investigator with DCFS. Waite testified that on February 15, 1998, he received a hotline phone call regarding the medical neglect of respondents' children, specifically I. Waite talked on the telephone with M.N. on February 25, 1998, to ascertain respondents' intentions regarding I.'s medical treatment. At that time, M.N. was uncertain whether they would continue taking I. to Dr. Nielsen. Waite stated that he told M.N. that it was necessary for respondents to follow Dr. Nielsen's treatment recommendations.

Waite further stated that he talked to M.N. in the middle of April 1998. M.N. told him that he was not going to take I. for any type of treatment because I. was not "sick." M.N. further told Waite that I. would not be getting "any shots" until he was five years old. Waite also testified that, at one point in the DCFS investigation, F.N. was informed that she had to meet in person with certain DCFS staff

persons but she failed to do so. Additionally, respondents did not provide Waite with their correct address or the names of the schools that their children attended. Eventually, Waite discovered that the family lived in the Hanson Motel in Aurora. Waite visited the motel and described the family's living arrangements in this way:

> "It is a motor-inn I guess you'd call it. The door opens to the outside. [It's a] one room sleeping quarters with a small kitchen off to one side and a bathroom. *** The hotel room [sic] was equipped for what [it] would take for ten people to live in there. There were two full-sized beds, [another] bed and one mattress on the floor that I could see, and the rest of the various clothing and belongings and food and such *** pretty much filled the quarters, making it difficult to really walk through. It was mostly full of the family's supplies."

Waite stated that I. had been taken into protective custody on April 17, 1998, and returned to respondents on April 21, 1998.

On cross-examination, Waite testified that M.N. had explained to him "that [he] had been beaten by the Sheriff and dragged out of his [Batavia] home in the middle of winter and that somehow the government was keeping him from being in that home." Waite further stated that he went to the Batavia address he had been given by respondents and found that it corresponded to an apartment building. Tenants in that building told Waite that the family had been evicted for the nonpayment of rent. Waite acknowledged that respondents brought their children to the DCFS office when requested to do so. The children appeared to be clean, appropriately dressed, and properly developed for their ages. He did not observe any "outward medical problems" or signs of neglect.

In the respondents' case, M.N. stated that I. was born with no health problems and that he remained in the hospital for several weeks due to his premature birth. According to M.N., Dr. Kopparthi told respondents that "a little something showed up on the ultrasound" which "could be something [or] could be nothing." Dr. Kopparthi told respondents that he wanted to do some further tests regarding I., particularly a computed tomography (CT) scan. Respondents told Dr. Kopparthi that they were opposed to the CT scan and asked if there was another procedure that could be performed. They agreed to have I. undergo a magnetic resonance imaging (MRI) procedure.

M.N. further testified that after the MRI had been performed on I., Dr. Kopparthi and "another expert" concluded that the baby was "perfectly normal." Dr. Kopparthi stated to respondents they could schedule a follow-up appointment with a specialist several months later for "their peace of mind." According to M.N., Dr. Kopparthi reit-

erated that I. appeared to be in perfect health and that respondents could take him to follow-up appointments if they were concerned that he was not developing properly.

M.N. then explained that, due to respondents' religious beliefs, their children were not taken in for routine well-baby checkups. They believed that God would let them know if something was wrong with their children. In M.N.'s view, I. appeared to be doing well. The inguinal hernia emphasized by Dr. Nielsen had been examined by other physicians, who determined that the hernia had "gone away." He also stated that none of the physicians who saw I. after February 25, 1998, observed that the baby had any trouble tracking with his eyes. M.N. conceded that I. was a "little bit cross-eyed." However, he stated that it was his understanding that it was normal for some babies to be cross-eyed until they became somewhat older.

M.N. further testified that respondents had taken some of their children to Dr. Hanson, a pediatrician, who was in the same practice group as Dr. Nielsen. Prior to I.'s birth, Dr. Hanson had substantially limited the number of patients he was seeing. Respondents then set up an appointment with Dr. Nielsen. After the February 25 examination by Dr. Nielsen, respondents concluded that they did not like her approach and decided to find a new pediatrician. M.N. testified that Dr. Nielsen wanted respondents to take I. to all follow-up examinations that she outlined. He stated that they thought I. was in good health and saw no reason to follow her recommendations. Further, he stated that Dr. Nielsen told them that she was not a specialist and was not qualified to make any judgments about I.'s need for follow-up care.

During cross-examination, M.N. stated that respondents had taken I. to a number of physicians following Dr. Nielsen's examination of him. He explained that I. had been examined by Dr. Bahtia, who concluded that there was nothing wrong with I.'s eyes. Additionally, M.N. testified that I. had been examined by Dr. Heideman, a neurologist, who performed a number of procedures on I., including an ultrasound, an MRI, and a CT scan. According to M.N., Dr. Heideman found nothing wrong with I. M.N. further explained that respondents had begun taking I. to Dr. Martz, a general practitioner, in late spring of 1998. Dr. Martz had examined I. several weeks before the subject hearing and had found no problems with I.'s eyes or general development. M.N. initially stated that he was not familiar with a Dr. Vasam but later conceded that respondents might have taken I. to be examined by Dr. Vasam on June 24, 1998. He explained that he "just [did not] know the names of all the doctors." Additionally, M.N. testified that respondents obtained whatever immunizations were necessary for their children to enroll in school.

Regarding the family's living circumstances, M.N. testified that the family was living in the Hanson Motel in Aurora because 2½ years earlier it had been illegally evicted from an apartment in Batavia by the Kane County sheriff's department. After the eviction, the family had to find housing that did not require a security deposit. M.N. explained that his family continued to stay at the motel because of respondents' belief that they would ultimately be able to return to the apartment from which they had been evicted. He conceded that his family had "essentially [been] evicted" from the Hanson Motel "but since [he] had been paying the rent, [the owner] let [the family] stay." M.N. acknowledged that in the weeks preceding the hearing the motel's owner had not been accepting his rent checks, which "normally that means *** [the owner is] getting ready to file for an eviction." M.N. agreed that finding a new place for the family to live was not the respondents' first priority. Further, M.N. acknowledged that an agency named Family First had been assigned by DCFS to help respondents obtain housing. However, respondents had not cooperated with Family First because they thought it was being too intrusive in other parts of their lives.

M.N. further stated that in January 1998 respondents applied for housing through the Aurora Housing Authority (Authority). In early June of 1998, respondents received a letter from the Authority telling them that their application was nearing the top of the public housing waiting list. At the time of the subject hearing, respondents' application was still pending. M.N. stated that he was not aware that some applicants have had to wait five years to obtain housing through the Authority.

M.N. stated that the family's motel room contained two double beds and a crib for the baby. Respondents slept in one of the double beds and two or three children alternated sleeping in the other double bed, with the rest of the children sleeping on the floor in sleeping bags and padded blankets.

According to M.N., the motel room cost $160 per week. He had a job delivering newspapers for which he was paid $75 weekly, plus an additional $200 per week in expense money. Additionally, the family received $520 per month in public aid, along with food stamps and medical coverage. He estimated that the family's total monthly income was approximately $1,400 per month. During the State's questioning of the respondents' finances, the following exchange took place:

"Q. So really your only expense is $160 a week [for the] Hanson Hotel [sic].

A. Rent. That is basically the only expense we have, because even the school fees and stuff is all waived.

Q. So you have rent of about $500 per month, does that sound about right?

A. *** I think it comes out to about $720 [a month].

Q. So what do you do with the other $700 a month that you have as net income?

A. Well, you know, I have a whole family to take care of. We have been like golfing every day, so the five of us bought season passes to the golf courses. We have been golfing, the five of us."

Further, M.N. conceded that respondents had not taken I. for any follow-up examinations until after the petition had been filed. He also acknowledged that respondents' decision to stop taking I. to see Dr. Nielsen was based in part on her threat to call DCFS if they did not follow her directions.

While F.N.'s testimony was generally similar to M.N.'s, she did elaborate on a number of relevant topics. She testified that Dr. Kopparthi told them that the follow-up examinations were merely recommendations and were not mandatory. She further stated that respondents' religious beliefs did not deny the need for people to seek medical treatment when it was necessary. F.N. stated that she performed the physical therapy on I. that was suggested when he was a newborn. She said that I.'s current physician, Dr. Martz, had not recommended that she do any further exercises with I.

On cross-examination, she stated that Dr. Heideman had explained to respondents that I. had not suffered a stroke before his birth. Rather, Dr. Heideman told them that the bleeding was actually "outside the brain." She could not recall taking I. to be examined by Dr. Vasam in June 1998. F.N. denied that I. experienced "little shakes" when he was picked up. She acknowledged that one of I.'s eyes "looked off to the side" occasionally.

In rendering its decision on paragraph 3.1 of the petition the trial court observed:

"[W]hen the Court did have an opportunity to observe I. it was certain observations were obvious to this Court that he was very tiny. That's not pointing the finger, putting blame on anyone. He was born premature. But every time this Court saw his eyes they were crossed, and his arms, his legs, and his neck clearly were nowhere near what would be deemed normal development. I am not a physician, but its does not take a physician to make those kind of observations. I believe that I. *** is at risk of harm."

The trial court found for the State on paragraphs 3.1 and 3.3 of the petition. It ordered, *inter alia*, respondents to undergo a "Social History Investigation."

Prior to the dispositional hearing that was held on October 5, 1998, DCFS workers Kathleen Ely and Delores Soule submitted their

report to the court. The report indicated that respondents had been cooperative and that both of them had been referred for a psychological evaluation in early September. However, Christopher Fontana, the psychologist to whom respondents were referred for evaluation, denied the referral. Fontana had reviewed M.N.'s "Fitness to Stand Trial Evaluation," which arose from an unrelated criminal action that was completed on February 4, 1998. In the evaluation, it was recommended that M.N. take certain psychotropic medications to "treat his delusional thought patterns." Fontana concluded that it would be virtually impossible to obtain a useful social history until M.N. was taking the psychotropic medication and had obtained "maximum therapeutic effect." Accordingly, Fontana "deferred" the referral. Similarly, Fontana "deferred" F.N.'s referral, concluding that she required the same approach as her husband.

The report also contained the results of interviews with respondents' children. The interviewers reported that all the children were dressed satisfactorily and were very polite. Documents attached to the report indicated that school officials were very positive about respondents' children, who made good grades and were involved in school activities. The children stated that they felt safe at home. The report recommended that the family stay intact and that adequate housing be secured as soon as possible. It was further recommended that M.N. see a psychiatrist to determine his need for psychotropic medication. Finally, the report recommended that I. receive treatment for his physical problems and that respondents follow all recommendations made by his physicians.

In reaching its determination, the trial court also relied on a report of the court-appointed special advocate (CASA) filed on August 31, 1998, which contained the following passage:

"Dr. Vasam, the examining physician of the minor [I.] after evaluating the results of recent exams of the minor *** advised [that] the minor has no visual tracking or visual focus. Dr. Vasam states [that] the minor appears to have suffered brain trauma but would have to review all prior medical records and have the minor re-examined by a neurologist or developmental psychologist prior to Dr. Vasam's re-examination. Dr. Vasam believes the minor *** requires physical therapy 2X [sic] per week, now! The [respondents] have refused to provide Dr. Vasam with any medical history and have stated their disagreement with Dr. Vasam's assessment. Dr. Vasam asked [respondents] to return the minor *** to the medical treatment program and [they] refused, stating there is nothing wrong with the minor except the minor is slow in developing due to the premature birth. DCFS sent a written request for the parents

to release the medical history of the minor \*\*\* and [there has been] no response after three weeks."

At the conclusion of the dispositional hearing, the trial court stated:

> "I will make a finding that the fitness to stand trial assessment that was completed by the Diagnostic Center on [M.N.] is not the equivalent of a psychological evaluation and ask DCFS to comply with the prior order of 8-31 to arrange for psychological evaluations for both [respondents], and [respondents] and DCFS will pursue the housing issue with diligence, that [respondents] will insure that I. receive all necessary medical treatments."

The trial court ordered that the family remain intact and that a further hearing be held on November 9, 1998, to hear testimony from Dr. Martz and to ascertain the status of the housing search and psychological evaluations. Respondents filed their notice of appeal on November 3, 1998.

Respondents first argue that the trial court's finding that I. was a neglected minor was against the manifest weight of the evidence and that its orders adjudicating him neglected and a ward of the court must be reversed. Respondents maintain that the fact that they disagreed with Dr. Nielsen's opinion that follow-up examinations were necessary does not constitute neglect. In response, the State argues that the trial court's finding of neglect was not against the manifest weight of the evidence. The State further contends that Dr. Nielsen made it clear to respondents that, because of I.'s intercerebral bleeding prior to birth and his premature birth, it was necessary for him to be seen by a number of specialists to determine if he was developing properly.

In *In re K.G.*, 288 Ill. App. 3d 728, 734-35 (1997), the court stated in relevant part:

> "We begin by noting that the best interest of the child is the paramount consideration whenever a petition for adjudication of wardship or any proceeding is brought under the Juvenile Court Act. [Citations.] It is the State's burden to prove the neglect or abuse alleged in any wardship petition by a preponderance of the evidence. [Citation.] Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not. [Citation.]
>
> At an adjudicatory hearing the trial court's first responsibility is to determine whether the minor is abused, neglected, or dependent. [Citation.] The concept of 'neglect' is not static. It has no 'fixed and measured meaning,' but draws its definition from the individual circumstances presented in each case. [Citations.] As a general rule, however, it is 'the failure to exercise the care that cir-

cumstances justly demand and encompasses both wilful and unintentional disregard of parental duty.' [Citation.]

Neglect based on 'injurious environment' is an 'amorphous concept' not readily susceptible to definition. [Citation.] Each case must be judged on its own merits, based on the particular circumstances present. [Citation.]

A trial court's determination of a neglect issue is entitled to great deference and will not be disturbed on appeal unless contrary to the manifest weight of the evidence. [Citation.] A trial court's finding is against the manifest weight of the evidence if a review of the record clearly demonstrates that the opposite result would be the proper one. [Citation.] After all, 'the trial court is in a much better position than is this court to observe the witnesses, assess credibility, and weigh the evidence.' [Citation.]"

■ Further, section 2—3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2—3 (West 1996)) states in pertinent part:

"(1) Those who are neglected include:

(a) any minor under 18 years of age who is not receiving the proper or necessary support, education as required by law, *or medical or other remedial care recognized under State law as necessary for a minor's well-being*, or other care necessary for his or her well-being, including adequate food, clothing and shelter *** or

(b) any minor under 18 years of age whose environment is injurious to his or her welfare[.]" (Emphasis added.)

■ Initially, we note there is little case law regarding medical neglect as a basis for finding a minor to be neglected. The few cases that involve medical neglect deal, in large part, with blood transfusions that are deemed necessary for a minor's survival but that are opposed by the minor's parents on religious grounds. See, *e.g.*, *People ex rel. Wallace v. Labrenz*, 411 Ill. 618 (1952); *In re E.G.*, 133 Ill. 2d 98 (1989). While this case does not involve the survival of the minor *per se*, it does deal with the physical and, possibly, mental development of a child who is at substantial risk due to his premature birth and the intercerebral bleeding that occurred prior to his birth. As such, we conclude that this case comes within the scope of the Act, specifically the part that addresses medical care necessary for the minor's well-being.

■ We are not persuaded by respondents' argument that the trial court's finding that I. was medically neglected was against the manifest weight of the evidence. There was more than sufficient evidence that I. had a number of conditions due to his premature birth and intercerebral bleeding that, if allowed to go untreated, had the potential to create lifelong problems for him. Specifically, Dr. Nielsen

testified that, in cases where there has been intercerebral bleeding prior to birth, a child's muscle tone, coordination, and speech development can be affected. Respondents did not agree with Dr. Nielsen's recommendations and essentially ignored them. The record demonstrates that, without the intervention of DCFS, respondents had no intention of following up on any recommendations made by Drs. Kopparthi and Nielsen. Further, even after DCFS had become involved in the case, respondents continued their pattern of not continuing to see physicians who had made recommendations with which they did not agree. For example, the record shows that they took I. to see Dr. Vasam sometime in June 1998. After her examination of I., Dr. Vasam concluded that I. had no "visual tracking or visual focus." Also, it appeared to Dr. Vasam that I. had suffered brain trauma. However, Dr. Vasam needed I.'s medical records to determine if this was indeed the case. Additionally, Dr. Vasam believed that I. required physical therapy two times a week. Apparently, respondents simply looked for another physician rather than acting on Dr. Vasam's recommendations.

Respondents' attempts to minimize Dr. Nielsen's capacity to diagnose I.'s condition and to make recommendations regarding his treatment are unavailing. We do not put much credence in M.N.'s testimony that Dr. Nielsen acknowledged to him that she was not a specialist and was not qualified to make any judgments regarding I.'s need for follow-up care. If indeed Dr. Nielsen was so seemingly ineffectual, it is difficult to comprehend why Dr. Kopparthi, a neonatalist, would have asked her to see I. after his discharge from the hospital. Moreover, Dr. Nielsen's testimony gave no indication that she believed herself to be unqualified to make recommendations for I.'s care. Additionally, respondents relied exclusively on their own testimony, wherein they indicated that various physicians had examined I. and found him to be in good health. However, they presented no other evidence to support their assertions. Thus, the trial court was entitled to conclude that respondents failed to present sufficient evidence to rebut the State's case.

In conclusion, we find that respondents were given clear recommendations regarding the necessary steps to ensure that I. developed properly. Their persistent unwillingness to provide the proper care for I.'s present and future physical needs constitutes medical neglect. Under these circumstances, the trial court was correct in finding that I. was medically neglected and in making him a ward of the court.

Respondents' next argument is that the trial court erred in finding that I.'s siblings were neglected on the basis of inadequate housing. They maintain that, although there was testimony that the family's living quarters were cramped, there was no evidence that

they were not receiving proper nutrition, were lacking in hygiene, were not properly attired, or were not properly educated. The State responds by pointing to testimony that indicated that respondents could easily have afforded larger living facilities. The State further asserts that instead of finding proper living arrangements respondents forced their children to sleep on the floor for 2½ years.

■ As noted above, neglect is not a static concept. Each case must be decided on its own merits. On its face, the reality of 10 people living in one motel room is a disturbing situation. It is easy to imagine how chaos and social deviance would reign in such a circumstance. However, the record demonstrates that respondents' children have been uniformly described as well-adjusted individuals who excel in the classroom and take an active part in school functions. School officials described them as "model students." In interviews, they were properly attired, clean, and responsive. Instead of being overwhelmed by their circumstances, they appeared to be progressing well through childhood, despite where they lived. There is no dispute that respondents had done a very poor job of providing living quarters for their children and that the sooner appropriate housing was found, the better. Additionally, the above-cited evidence that M.N. purchased a number of season passes to local golf courses, rather than putting that money aside for a security deposit for an apartment, is troubling. Nevertheless, in this case, we cannot agree with the trial court that the cramped quarters in which the children had been living served as an adequate basis for finding them neglected. Standing alone, the lack of adequate housing, which appeared to be a minor hindrance to the children, was not enough in this circumstance upon which to base a finding of neglect. Accordingly, we reverse the trial court's finding that I.'s siblings were neglected.

Finally, respondents contend that the cause must be remanded for a new dispositional hearing because the trial court improperly considered a fitness evaluation of M.N. in an unrelated case. Respondents argue that M.N. never gave his informed consent to the release of the evaluation. The State responds that the Act permits the introduction of such evidence with or without the father's consent and that the information contained in the fitness evaluation would have been eventually discovered.

Respondents' argument is thoroughly unpersuasive. Even assuming *arguendo* that respondents' contention is correct, it is readily apparent that the trial court paid little or no attention to the subject fitness evaluation. The trial court went so far as to say that the fitness evaluation was not the equivalent of a psychological examination and directed DCFS to arrange for psychological evaluations of respondents.

1010

Clearly, the fitness evaluation played virtually no part in the trial court's determination of the case. Under these circumstances, there is no reason to remand this cause for a new dispositional hearing.

For the reasons stated above, we affirm the circuit court of Kane County's decision that I. was medically neglected and its determination to make him a ward of the State. Further, we reverse the circuit court's finding that the respondents' other children were neglected.

Affirmed in part and reversed in part.

THOMAS and HUTCHINSON, JJ., concur.