2021 IL App (1st) 192633-U

FIRST DISTRICT
FIRST DIVISION
June 30, 2021

No. 1-19-2633

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF A.A., a minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | No. 19 JA 927 |
| | ) | |
| v. | ) | Honorable |
| | ) | Robert Balanoff, |
| T. A., | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

JUSTICE COGHLAN delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Adjudicating the minor abused and neglected was not against the manifest weight of the evidence.

¶ 2    Mother-respondent T.A. appeals *pro se* the juvenile court's finding that her minor daughter, A.A. (born on February 23, 2006), was neglected due to lack of care, neglected due to an injurious environment, and abused due to a substantial risk of physical injury and placing her in the guardianship of the Department of Children and Family Services (DCFS).[1] We affirm.

---

[1] J.S. and all unknown fathers were defaulted by publication during the underlying proceedings. A.A.'s father did not participate in this appeal.

¶ 3                                    BACKGROUND

¶ 4          On August 21, 2019, the State filed a petition for adjudication of wardship of A.A. pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1, *et seq.* (West 2018)), contending she was neglected due to lack of necessary care (705 ILCS 405/2-3(1)(a) (West 2018)), neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)), and abused due to substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2018)). In support of its petition, the State alleged that:

> "Mother has one prior indicated report for inadequate supervision. On or about August 11, 2019 [A.A.] was psychiatrically hospitalized due to anxiety, aggression and psychosis. Minor has been diagnosed with schizophreniform disorder which is a form of psychosis. Mother refuses to consent to psychotropic medications for this minor while she is hospitalized. Medical personnel state that if minor's condition is not treated, her brain tissue can start to deteriorate. Father's whereabouts are unknown."

The State also filed a motion for temporary custody, asserting that there was probable cause that A.A. was neglected and abused as detailed in the petition and that reasonable efforts could not prevent or eliminate the necessity of removing A.A. from her home.

¶ 5          On the same day (August 19), the juvenile court held a temporary custody hearing. At the conclusion of the hearing, the court found that probable cause existed that A.A. was abused and neglected and there was immediate and urgent necessity to remove A.A. from the home. The court granted temporary custody to DCFS and appointed the Public Guardian as A.A.'s guardian *ad litem*. Although the report of proceedings was not included in the record, the order indicated that T.A. received notice and was present. The court appointed an attorney to represent T.A. but the case was continued because she "requested more time to hire counsel."

¶ 6          On September 12, 2019, court appointed attorney Steven Silets filed an appearance on

behalf of T.A. but withdrew his representation on October 15, 2019. On October 8, 2019, James Hagler of the Law Offices of Jeffery M. Leving, Ltd filed an additional appearance but withdrew on November 20, 2019. On November 27, 2019, T.A. filed a notice to appear *pro se*.

¶ 7 On December 10, 2019, the juvenile court held a case management conference[2] and entered an order finding neglect due to lack of care, neglect due to environment injurious, and abuse due to substantial risk of physical injury. The court set the adjudication, disposition, and permanency hearings for January 17, 2020.

¶ 8 On December 31, 2019, T.A. filed a motion for an interlocutory appeal, "requesting leave for an Emergency Motion to Compel Visitation Order," arguing that she was wrongly denied visitation. On January 13, 2020, this court denied the interlocutory appeal.

¶ 9 On the same day that this court denied her interlocutory appeal, T.A. filed "respondent's notice of Indian Lineage," asserting that A.A. "is a descendant of the Blackfoot nation." She argued that under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1911(a) (1988)), A.A.'s "Indian tribe has jurisdiction over Indian child proceedings" and "has a direct interest in protecting her, an Indian child, from the removal of her home by nontribal public and private agencies." T.A. attached a letter dated January 21, 2020 (eight days later) addressed to the United States Department of the Interior, stating that she was "the tribal representative for The Blackfoot Tribe, Illinois," which "are the surviving descendants of the Blackfoot Nation not residing on any Indian reservation but primarily banded together in Illinois," and that the "tribe is awaiting notice (25 CFR § 23.11) of the proceedings to intervene and prevent the breakup of the Indian family." On January 29, 2020, the juvenile court found that the ICWA "does not apply in this case. [A.A.] is not an Indian child under the Act."

---

[2] No report of proceedings was included in the record.

¶ 10                                    Adjudication Hearing

¶ 11          On January 17, 2020, the juvenile court appointed Stephen Jaffe as standby counsel for T.A. On February 10, the court held an adjudication hearing, which was scheduled for 1 p.m. but began after 1:30 p.m. "for [T.A.] to appear"[3] but she did not.

¶ 12          During the hearing, the State offered A.A.'s medical records from 2016 through 2019 as exhibits. A.A.'s hospitalization (August 12, 2019 through October 11, 2019) at AMITA Alexian Brothers Behavioral Health Hospital (Alexian Brothers) led to the underlying adjudication proceedings. Dr. Shubhrajan Wadyal was A.A.'s treating psychiatrist at Alexian Brothers and diagnosed her with "schizophreniform disorder and severe reactive attachment." Dr. Wadyal's notes state in pertinent part:

> "I [spoke] with the patient's mother for over 45 minutes about the patient's challenges with mental illness the patient's issues with irritability[4] and the importance of medication compliance. The patient's mother reports to me that the patient has no history of mental health treatment. However upon reviewing previous notes for the patient's outside physician the patient has a long history of OCD and anxiety and potential psychosis. The patient's mother has a great deal of difficulty with understanding that the patient has a mental health diagnosis and she believes that her entirety of illness is based on PANDAS.[5] The patient has been treated for PANDAS by an outside immunologist and has received

---

[3] In a pleading, T.A. acknowledged that the adjudication hearing was "set for Monday, February 10th at 1:30."

[4] In 2016, when A.A. was 9 years old, she was hospitalized for "severe anger and rage" and T.A. stated that A.A. had "been impulsive and combative since she was about 3."

[5] In January of 2019, Dr. Miroslav Kovacevic treated A.A. for PANDAS (Pediatric Autoimmune Neuropsychiatric Disorder associated with group A Streptococcus) by administering an IVIG Gammagard dose.

immunoglobulin treatments.[6] the patient has not had any improvements with those immunoglobulin treatments. the patient's mother says to me 'she is not crazy she acts this way because has a pices' [sic]. I discussed with the patient's mother at length the different medication options that are available she patent[ly] refuses any medication options.[7] *** The patient's mother uses foul language towards me and is very irritable and my try to present further options to her she hangs up the phone on me. *** Reports she does not want PT on any psych medications. *** Wants her in therapy and counseling. *** I [spoke] to the patient's mother who reports that she is very upset that I have only given her 48 hr to consider medication I employ her about the importance of the patient having the current psychotic thought process stopped as psychotic thought process could lead to apoptosis change in the frontal lobe. I indicate[d] to her that this change *** could lead to long-term challenges with further mental health challenges. The patient's mother is verbally abusive towards me and uses multiple cuss words[8] and is very angry with me and I discussed with her that I feel this is medical neglect given the severity of the patient's illness. I discussed with her that unfortunately *** I have to report this to the Department of Children and

---

[6] Regarding any autoimmune issues, Dr. Wadyal documented that he "spoke with the patient's outpatient immunology specialist and he indicated to me that given that the patient is not improved [ ] with immunoglobulin or long-term antibiotics that [PANDAS] was [ ] likely not the cause of the patient's psychiatric care and it is rather organic in nature."

[7] The treatment notes for May 27, 2016, when A.A. was hospitalized at Garfield Park Hospital, stated: "Patient's mother clarified that patient used to take Tenex without benefit, so it was stopped." The emergency department documentation for September 14, 2017, when A.A. was hospitalized at Advocate Christ Hospital and Medical Center, included the following: "mom states that she took pt off of all her meds including respiridol because she wants the pt to have a clean slate." The progress notes for A.A.'s November 11, 2017, hospital admission stated that "Per mother pt started talking to herself after being placed on Risperdal. Mother stated she took pt off all medications after this behavior worsened."

[8] The treatment notes relating to A.A.'s 2018 hospitalization at Garfield Park Behavioral Hospital similarly stated that "[T.A.] was verbally aggressive due to medication change and forcing her to take medication she does not need." T.A. responded to the request to increase A.A.'s dosage of Risperdal by making "comments littered with profanity" and refused to approve the increase.

Family Services. *** I feel the patient would benefit from an atypical antipsychotic and/or a mood stabilizer however the patient's mother is not consented."

¶ 13　　In addition to the medical records, the State offered the testimony of DCFS child protection investigators Hilda Stanley and Priscilla Cash. Both investigators were assigned to A.A.'s case while she was hospitalized at Alexian Brothers.

¶ 14　　Stanley testified that she was assigned to A.A.'s case on August 14, 2019. Stanley spoke with A.A. in person, but "it was hard to engage her." She explained that A.A. "was sitting under her desk *** had her hands over her head, and she seemed disconnected, didn't really understand or comprehend what I was asking her." A.A. did tell her, however, "that she did not attend school."

¶ 15　　Stanley did not speak with T.A. but saw her in the hospital's lobby. T.A. "was very disruptive in the lobby. She didn't seem to be appropriate herself. And I just overheard her *** basically saying they were trying to put [A.A.] on medication. She's not having it. There is nothing wrong with her, and she needs her sanitary napkins." Stanley was concerned that T.A. "did not understand or comprehend exactly what her daughter was going through and why she was admitted there in the first place." Stanley also spoke with Dr. Wadyal and became concerned about A.A.'s mental health and T.A.'s ability to care for her.

¶ 16　　Priscilla Cash testified that she was assigned to A.A.'s case on August 19, 2020. On the next day, she spoke with T.A., who stated that A.A. "had never been psychiatrically hospitalized" and did not have a mental health diagnosis. T.A. indicated that "her daughter had some type of autoimmune disease" and "needed like a peer group, some type of therapy with other children." T.A. "said that her daughter was in need of antibiotics *** she did not feel that it was life-threatening." After speaking with Dr. Wadyal, she also became concerned about A.A.'s mental health and T.A.'s ability to care for her.

¶ 17    After the State and Public Guardian both rested, the juvenile court continued the hearing "to give the mother an opportunity to come in and present whatever witnesses or evidence she has."

¶ 18    On February 14, 2020, the adjudication hearing reconvened. T.A. again did not appear and the day before this hearing, she filed a "cease and desist notice," objecting to the appointment of standby counsel because she "did not consent to a court-appointed counsel." T.A. "demand[ed] that Mr. Jaffe cease and desist of his acceptance of appointment as standby counsel, on the record immediately." The juvenile court continued with the hearing and the State and Public Guardian argued for a finding of neglect and abuse.

¶ 19    At the conclusion of the adjudication hearing, the juvenile court found that the "State has met their burden of proof by a preponderance of the evidence" and held that A.A. was neglected due to lack of care, neglected due to an injurious environment, and abused due to a substantial risk of physical injury. The court explained:

> "I think it's very clear that the mother lies. I won't say that she misstates, she lies about her daughter's medical condition. It's very clear from the medical records and the evidence, the testimony, which was credible, that she disregards medical advice, she does things to her child that are damaging to her child. And I will note that *** the doctor *** says *** that I feel *** this is medical neglect, given the severity of the patient's illness. I would concur, that certainly is clear from all of the medical records and the evidence that the mother feels that she knows better than anybody about the care of her child and treatment for her child, and refuses the continuation of treatment even when it is clear that the child is benefiting from this."

¶ 20    The dispositional hearing immediately followed. Lori Booker, a DCFS case worker assigned to A.A.'s case since August 27, 2019, testified that A.A. was hospitalized in the

Comprehensive Assessment and Treatment (psychiatric) Unit (CATU) at University of Illinois at Chicago Hospital, receiving 24-hour psychiatric care and medication. Upon discharge, A.A. "most likely will still be getting some type of psychiatric treatment, individual therapy, a group therapy, and soon after then, hopefully, family therapy. And hopefully, some education[ ] for her" since she had not been in school for some years.

¶ 21    Booker stated that T.A. was referred for individual therapy and a psychologist "just to evaluate to see if she may need treatment within that department" but "[t]hey haven't been able to locate her." DCFS last had contact with T.A. in November of 2019. Although T.A. was allowed supervised visits, she last visited A.A. on December 15, 2019.[9] She recommended that it was in A.A.'s best interest to be placed in the guardianship and custody of DCFS. Booker explained that "right now the mother is not being in compliance with any of the services, she's not visiting with the daughter, and she doesn't comply with the needs from physicians or DCFS on what may be best for her daughter."

¶ 22    At the conclusion of the dispositional hearing, the juvenile court made A.A. a ward of the court and placed her under DCFS guardianship, explaining that "[i]t's clear that [if[ the minor was returned home to the mother, that the medical services would probably be stopped and changed, or the medication would, so that is not an option." The court found T.A. "to be unable and unwilling to work towards reunification of her child" and "needs individual therapy" and "psychiatric and a psychological assessment." The court also left Jaffe "in place" to make him available to consult with T.A.

¶ 23    The matter then proceeded to the permanency hearing and the juvenile court "set the goal at return home pending status." The court stated that A.A.'s "placement at this point is necessary

_____

[9] DCFS reached out to T.A. to plan a Christmas visit, but T.A. did not respond.

and appropriate" and "[t]his goal is in the minor's best interest, as it is the fastest, quickest path to permanency, whether a return home to her mother, independence, or with another foster family or a foster parent who is willing to adopt or provide guardianship."

¶ 24                                                    ANALYSIS

¶ 25        At the outset, the Public Guardian[10] urges this court to strike T.A.'s opening brief and dismiss her appeal for failing to comply with Illinois Supreme Court Rule 341(h) (Ill. S. Ct. R. 341(h)(1)-(9) (eff. Nov. 1, 2017), arguing that the "entire brief does not comport with Rule 341 and the lack of an appendix violates Rule 342." *Pro se* litigants are presumed to have the requisite knowledge of court rules and procedures and must comply with them as would be required of litigants represented by attorneys. *Steinbreacher v. Steinbrecher*, 197 Ill. 2d 514, 528 (2001); *In re Estate of Pellico*, 394 Ill. App. 3d d1052, 1067 (2009). Although this court may justifiably strike T.A.'s brief for the manifest failure to conform to the rules, striking an appellate brief is a harsh sanction and only appropriate when the alleged violations hinder our review. *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005). Because we can generally decipher T.A.'s claims and the Public Guardian provided a detailed statement of facts, we decline the request to strike her brief and dismiss the appeal. *Budzileni v. Department of Human Rights*, 392 Ill. App. 3d 422, 440 (2009).

¶ 26        As to the merits, T.A. first claims that the juvenile court lacked subject matter jurisdiction because "the Blackfoot Tribe Illinois held tribal court and took guardianship of the minor" and "the tribal court order preempts the actions of the Juvenile Court."

¶ 27        The ICWA provides a tribal court with exclusive jurisdiction "over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such

_____

[10] The State filed a separate brief adopting the Public Guardian's facts and arguments.

tribe." 25 U.S.C. § 1911(a) (1988); *In re Adoption of S.S.*, 167 Ill. 2d 250, 258 (1995). If an "Indian child" is not domiciled or residing within the reservation, concurrent but presumptively tribal jurisdiction is created and the state court must transfer jurisdiction over the proceedings to the tribal court, except in cases of "good cause," objection by either parent, or declination of jurisdiction by the tribal court. *In re Adoption of S.S.*, 167 Ill. 2d at 258 (citing 25 U.S.C. § 1911(b) (1988)). Under the ICWA, an "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (1988). The party asserting the ICWA's applicability bears the burden of producing sufficient evidence for the court to determine whether the child is an "Indian child." *In re C.N.,* 196 Ill. 2d 181, 205 (2001); *In re M.S.,* 302 Ill. App. 3d 998, 1001 (1999). We review this jurisdictional issue *de novo*. *In re C.N.,* 196 Ill. 2d at 203; *In re Luis R.*, 239 Ill. 2d 295, 299 (2010).

¶ 28    Relevant here is whether A.A. qualifies as an "Indian child" within the meaning of the ICWA. We find that T.A.'s unsubstantiated statements that she was "the tribal representative" and A.A. was an "Indian child" insufficient to implicate the ICWA.[11] *In re C.N.,* 196 Ill. 2d at 206; *In re M.S.,* 302 Ill. App. 3d at 1001. Therefore, the juvenile court properly exercised jurisdiction over this matter.

¶ 29    T.A. also argues that the juvenile court lacked personal jurisdiction because she did not receive "service of process of notice of the date and time of the adjudicatory hearing, nor does the court record contain any proof of certificate of service."

¶ 30    It is well settled that personal jurisdiction over a party to a proceeding "may be established either by service of process in accordance with statutory requirements or by a party's voluntarily

---

[11] The record does not include the report of proceedings of the juvenile court's finding that A.A. was not an "Indian child."

submission to the court's jurisdiction" by appearing in the proceedings. *BAC Home Loans Servicing, L.P. v. Mitchell*, 2014 IL 116311 ¶ 18; *In re D.J.S.*, 308 Ill. App. 3d 291, 294 (1999); see 705 ILCS 405/2-15(7) (West 2018) ("appearance of the minor's legal guardian *** in any proceeding under this Act shall constitute a waiver of service of summons and submission to the jurisdiction of the court"). We review personal jurisdiction issues *de novo* and may consider the whole record, including the pleadings. *In re J.B.*, 2018 IL App (1st) 173096, ¶ 31.

¶ 31    Here, the juvenile court's orders were not void because the court acquired jurisdiction over T.A. when she personally appeared at the first court date on August 21, 2019. Although the record does not include any receipt demonstrating service of the summons, the temporary custody hearing order indicated that T.A. received notice and was present at that initial hearing. Therefore, the court properly exercised *in personam* jurisdiction over T.A. because she subjected herself to the court's jurisdiction. *In re D.J.S.,* 308 Ill. App. 3d at 294.[12]

¶ 32    T.A. next challenges the adjudication-order, arguing that she "did not refuse or was non-compliant with medical treatment for the minor at AMITA Health Alexian Brothers Behavioral Hospital or elsewhere."

¶ 33    The Act provides a step-by-step process to use "to decide whether a child should be removed from his or her parents and made a ward of the court." *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004); *In re C.E.*, 406 Ill. App. 3d 97, 107 (2010). After a child is placed in temporary custody, the juvenile court must determine at the adjudication hearing whether the child is abused, neglected, or dependent. *In re Arthur H.*, 212 Ill. 2d at 462 (citing 705 ILCS 405/2-21(1) (West 2000)). If such a finding is made, the court must conduct a dispositional hearing to determine whether the minor should become a ward of the court. *In re Arthur H.*, 212 Ill. 2d at 464 (citing

---

[12] In her brief, T.A. states the "defendant first appeared Juvenile Court on 21 August 2019" and she acknowledged that she received a copy of the petition.

1-19-2633

705 ILCS 405/2-21(2) (West 2000)); *In re D.R.*, 354 Ill. App. 3d 468, 473 (2004) (citing 705 ILCS 405/2-22(1) (West 2002)).

¶ 34 A finding of neglect is decided on the unique circumstances of each case. *In re Arthur H.*, 212 Ill. 2d at 463; *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29. A neglected or abused minor is defined as a minor "who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being." 705 ILCS 405/2-3(1)(a) (West 2018). Neglect subject to an "injurious environment" is "an amorphous concept that cannot be defined with particularity," but has generally "been interpreted to include 'the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children.' " *In re Arthur H.,* 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 349 (2000)). An abused child also includes a minor whose parent "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2018).

¶ 35 The State must prove its allegations of abuse and neglect by a preponderance of the evidence, which means "that the allegations of neglect [or abuse] are more probably true than not." *In re A.P.,* 2012 IL 113875, ¶ 17. We will not reverse the juvenile court's findings of neglect unless they are against the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident. *Id.* Because of the "delicacy and difficulty of child custody cases, it is well settled that wide discretion is vested in the trial judge to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied." (Internal quotation marks omitted.) *In re R.S.*, 382 Ill. App. 3d 453, 459-60 (2008).

¶ 36 Based on our review of the record, we reject T.A.'s claim that the juvenile court's finding of neglect and abuse was against the manifest weight of the evidence. The testimony at the

adjudication hearing and the medical records established that T.A. (1) denied consent for recommended medical treatments, (2) stopped administering prescribed medicine as directed, (3) failed to accurately disclose A.A.'s medical history by not revealing prior mental health diagnoses and hospitalizations, and (4) refused to acknowledge A.A.'s psychological diagnosis and grasp the severity of her illness. T.A. offered no contrary evidence.

¶ 37    On several occasions, this court has held that a minor who did not receive appropriate medical care was a neglected minor. *In re Adam B.*, 2016 IL App (1st) 152037, ¶ 38; *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 9; *In re Stephen K.*, 373 Ill. App. 3d 7, 21 (2007); *In re N.,* 309 Ill. App. 3d 996, 1007-08 (1999). The same holds true under the unique facts of this case. A.A.'s severe psychological illness combined with T.A.'s history of impeding the rendering of necessary medical care along with her purposeful failure to fully disclose A.A.'s medical history supports the juvenile court's finding of neglect. 705 ILCS 405/2-3(1)(a) (West 2018).

¶ 38    Moreover, this record does not support T.A.'s assertion "that each time she sought to exercise her and the minor's human rights to ensure her daughter received humane care she was threatened and intimidated by healthcare professional." We find the opposite to be true. This record is replete with instances of T.A.'s angry outbursts and use of profanity[13] directed towards individuals concerned with A.A.'s medical care and well-being. See *In re A.W.*, *Jr.,* 231 Ill. 2d 241, 261-62 (2008) (finding of neglect subject to an injurious environment was not against the manifest weight of the evidence where "the respondent father had a history of engaging in angry outbursts and issuing threats of violence to various individuals including DCFS personnel concerned with the minors' wellbeing."). Because this record does not lead us clearly to an opposite conclusion, the juvenile court's finding of neglect due to lack of necessary care was not

_____

[13] T.A. acknowledged her use of profanity, stating that "[n]either can the mere fact that the defendant used language he (Dr. Wadyal) disliked, is sufficient grounds to claim the minor life was in imminent danger and the mother refused medical treatment."

against the manifest weight of the evidence and we need not find neglect or abuse on any other basis to affirm the court's adjudication order. 705 ILCS 405/2-3(1)(a) (West 2010); see *In re Faith B.*, 216 Ill. 2d 1, 14 (2005) ("when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld").

¶ 39    T.A. also challenges the juvenile court's "dispositional and permanency orders," which made A.A. a ward of the court and granted guardianship to DCFS. Because T.A. did not separately argue this point in her brief, we will not consider the merits of the juvenile court's dispositional and permanency findings. Moreover, the juvenile court's permanency order is not before this court for review because it was not a final order. *In re V.M.*, 352 Ill. App. 3d 391, 396-97 (2004). Even if we were to construe T.A.'s bases for challenging the adjudication order to encompass a challenge to the dispositional order, we have found that the adjudication findings were not against the manifest weight of the evidence and the same would hold true regarding the dispositional order.

¶ 40    T.A. further argues that she received ineffective assistance of counsel. Regarding court-appointed attorney Silets, T.A. claims he "only served to facilitate judicial business, but did not aid the defendant in understanding her rights or in preparing a defense to the only allegation then of child abuse/neglect." As to the Leving law firm, she argues, among other things, that "the law firm did not provide her with a copy of [her] case file *** the same day it withdrew" and "failed to challenge the SAO's disproportionate discovery requests allowing Assistant State's Attorney to go on a fishing expedition against the defendant."

¶ 41    Parents in a termination of parental rights proceedings are afforded with the statutory right to effective assistance of counsel. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 41. A parent's claim of ineffective assistance of counsel is analyzed under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* ¶ 42. Under *Strickland*, the parent must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced his or her

defense. *Id.* (citing *Strickland*, 466 U.S. at 687). The parent must satisfy both prongs to prevail on an ineffective assistance of counsel claim. *Id.*

¶ 42 Here, T.A. failed to satisfy the *Strickland* test. Both Silets and the Leving law firm represented T.A. during the initial court proceedings where mainly continuances were filed or medical records requested. T.A. offered no credible evidence and there is no basis to find that either attorney's performance was deficient during those routine administrative matters and proceedings or that she suffered prejudice. Therefore, T.A.'s ineffective assistance of counsel claims fails.

¶ 43 In a related matter, T.A. argues that her "self-representation [was] obstructed by appointment of stand-by counsel" since she "chose to voluntarily and intelligently proceed without counsel." Because the juvenile court knew that standby counsel did not represent T.A. and "can't make a decision," we find no merit in this claim.

¶ 44 Finally, T.A. argues that numerous "procedural due process violations" occurred during the proceedings. First, T.A. argues that the notice of her rights[14] sent by standby counsel was "invalid because the jurisdiction and venue [did not] appear at the top of the document" and "the notice [was] not a complete list of the defendant's rights nor [did] it state that the Juvenile Court Act of 1987 governs proceedings in the Child Protection Division."

¶ 45 Because the record does not include the transcript from the proceedings where T.A. first appeared to determine whether she was admonished of her rights, we must presume the juvenile court adhered to the statute and informed T.A. of her rights. See *Haudrich v. Howmedica, Inc.,* 169 Ill. 2d 525, 546-47 (1996) (any doubt created by an omission in the record is construed against

---

[14] Under the Act, "[e]ach adult respondent shall be furnished a written 'Notice of Rights' at or before the first hearing at which he or she appears." 705 ILCS 405/1-5 (West 2018). A parent has "the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel." 705 ILCS 405/1-5 (West 2018).

the appellant); *People v. Jordan*, 218 Ill. 2d 255, 269 (2006) ("We must presume that a trial judge knows and follows the law unless the record demonstrates otherwise"). Even assuming *arguendo* deficiencies with the formal notice provided to T.A., she suffered no prejudice because the record establishes that she had actual knowledge of her rights, as evident by her decision to appear *pro se*, request transcripts, and appeal.[15] *In re Kenneth F.*, 332 Ill. App. 3d at 680.

¶ 46    T.A. also argues, and filed motions in this court, that her "right to discovery to thoroughly prepare for trial and minimize surprise at trial was unnecessarily obstructed" because the juvenile court denied her the "right to receive over 1,600 pages of discovery of medical records requested [by] the State's attorney." She claims that she was "unable to prepare and present a defense to past allegations regarding the minor's care" because she received "discovery on two compact disks" and not "hard copies." We will not address this contention because T.A. offered no law supporting her claim that she was entitled to receive a "hard copy" of discovery.[16] Likewise, there is no basis to find that T.A. was wrongly deprived of DCFS's "Investigation Transaction/Handoff Document" because that document was not submitted as evidence.

¶ 47    We summarily dismiss the remaining "procedural due process violations." Contrary to T.A.'s claim, the adjudication order only addressed the allegations of neglect and abuse set forth in the petition and she was properly named in the petition as "respondent" and not "defendant." See *In re A.P.*, 179 Ill. 2d at 188 (an adjudication hearing "is civil in nature"). The dispositional hearing may be held *instanter* following the adjudication hearing. 705 ILCS 405/2-21(2) (West 2018) (a court finding a minor to be abused, neglected, or dependent "shall then set a time not later than 30 days after the entry of the finding for a dispositional hearing") Illinois Supreme Court Rule 904 (Ill. Sup. Ct. R. 904 (eff. July 1, 2006)), an adjudicatory hearing for authoritative intervention

---

[15] In her opening brief, T.A. acknowledged that the judge "did inform [her] of her right to be heard or receive written information about the process."

[16] The juvenile court stated that T.A. "was offered exhibits in this case, she refused them."

(705 ILCS 405/3-16(1)(a) (West 2018)), and early termination of reasonable efforts to reunify the minor with her parents (705 ILCS 405/2-13.1 (West 2018)) did not apply to this adjudication proceeding. There was no basis to stay proceedings in the juvenile court while her interlocutory appeal was pending and ultimately denied. See Ill. Sup. Ct. R. 306 (a)(5), (6) (eff. Nov. 1, 2017).

¶ 48                               CONCLUSION

¶ 49         For the reasons stated, we affirm the juvenile court's judgment.

¶ 50         Affirmed.