NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200563-U

NO. 4-20-0563

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 8, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* R.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
|       Petitioner-Appellee, | ) | No. 19JA106 |
|       v. | ) | |
| Camilla C., | ) | Honorable |
|       Respondent-Appellant). | ) | Scott D. Larson, |
| | ) | Judge Presiding. |

---

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice Knecht and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's October 2020 neglect finding was not against the manifest weight of the evidence.

¶ 2    In December 2019, the State filed a petition for adjudication of wardship as to R.R. (born in September 2009), the minor child of respondent, Camilla C., asserting the minor child was neglected. After an October 2020 adjudicatory hearing, the Adams County circuit court found R.R. was neglected. After a November 2020 dispositional hearing, the court (1) found respondent unfit and unable to care for R.R., (2) made R.R. a ward of the court, and (3) placed R.R.'s custody and guardianship with the Department of Children and Family Services (DCFS).

¶ 3    Respondent appeals, contending the circuit court erred by finding R.R. was neglected. We affirm.

¶ 4                                 I. BACKGROUND

¶ 5            R.R.'s father, Reggie H., is not a party to this appeal. The State's December 2019 petition asserted R.R. was a neglected minor by reason of the following four facts. First, on December 3, 2019, respondent brought R.R. to Blessing Hospital for a psychiatric evaluation. Respondent failed to cooperate with staff and left against advice with R.R. receiving no treatment. Second, R.R. had been diagnosed with oppositional defiant disorder and attention-deficit/hyperactivity disorder. He also had exhibited self-harm, such as head banging, in the past. R.R. was on medication for the disorders. Third, on December 4, 2019, respondent failed to cooperate with a DCFS investigator and threatened the investigator with a metal shovel. Later that day, respondent was arrested for methamphetamine delivery in Adams County case No. 19-CF-993. Fourth, on December 20, 2019, R.R. was out of control at school and was engaging in head banging and self-harm. R.R. was taken to Blessing Hospital. Respondent refused to cooperate with R.R.'s admission, which was medically necessary.

¶ 6            On October 14, 2020, the circuit court held the adjudicatory hearing. The State presented the testimony of Robert Shafer, a DCFS investigator. It also presented a certified copy of R.R.'s records from Blessing Hospital and an investigation transition document by DCFS. Additionally, the State asked the court to take judicial notice of the court file in respondent's criminal case. Respondent did not present any evidence.

¶ 7            Shafer testified DCFS received a hotline call on December 4, 2019, concerning R.R., who was 10 years old at the time of the call. The allegations assigned based on the call were medical neglect and environment injurious to health and welfare by neglect. Respondent was identified as the perpetrator. Based on Shafer's investigation, both allegations were indicated. As part of his investigation, Shafer went to respondent's residence unannounced.

R.R. answered the door wearing only shorts. R.R. did not have any obvious signs of abuse. Shafer explained he was there to check on R.R. and to speak with both him and his mother. R.R. closed the door, and respondent came to the door. When Shafer asked if he could come in the home, respondent stated she did not want Shafer coming into the home. Respondent stated she was recovering from the "flu." Shafer asked respondent her version of what happened the night before when R.R. was taken to Blessing Hospital. Respondent explained R.R. was out of control and ran from home, and she called the police. Respondent had been unable to catch R.R. Shafer also asked respondent what medications R.R. was taking. She responded Adderall. Based on information he had received from the hospital, Shafer asked respondent if R.R. was supposed to be taking Vyvanse as well. Respondent asked Shafer why she would lie about R.R.'s medication. Shafer told respondent he did not think she was lying and explained he was just trying to get a clear picture of R.R.'s medications. Shafer also asked respondent what her follow-up plan for R.R. was, and respondent stated she was going to take R.R. to Mark Twain Behavioral Health in Hannibal, Missouri.

¶ 8 As Shafer and respondent were talking, R.R. came up to the door, shoved respondent out of the way, and slammed the door. Eventually, respondent came back to the door. Shafer stated he would like to talk about services for R.R. and to see what assistance DCFS could offer. Respondent indicated she was not interested in services from Shafer or DCFS and became more irate towards Shafer. Shafer advised respondent he would likely be getting the court involved in services. Due to "her growing escalation," Shafer walked away from the front porch. He explained respondent's behavior as going from moments of calm to agitation quickly. As Shafer was walking back to his vehicle that was parked across the street from respondent's home, he looked back and saw respondent following him and dragging a snow shovel. There

was no ice or snow on the ground, and respondent followed him to the middle of the street. R.R. was standing on the front porch, yelling at respondent to come back to the porch. Shafer told respondent she needed to return to the front porch and move away from his vehicle. Shafer was able to leave the area without further incident. Shafer was unable to do a home safety checklist, a drug and alcohol assessment, and a domestic violence assessment.

¶ 9　　　　　Shafer met with respondent again on December 13, 2019, at the Adams County jail. Respondent's plan was to find a residential facility for both her and R.R. If that did not work out, respondent said she was going to seek guardianship for R.R. with her husband or her adopted father. Respondent also agreed to opening a case with the Intact Family Services Program, which would allow the child to stay in the home and a caseworker would be assigned to the child. Shafer informed his supervisor about respondent's willingness to open such a case, and they began to make arrangements to get the case started.

¶ 10　　　　　On December 20, 2019, Shafer received a call from Luke Humke, the resource officer at R.R.'s school, requesting assistance with R.R. When Shafer arrived at the school at 11:25 a.m., R.R. was in a seclusion room. R.R. was trying to get out of the room by pushing past staff. Shafer observed R.R. trying to rip up papers and throw stuff. Shafer had been advised R.R. had been kicking and head butting the wall. R.R.'s foot was bleeding from kicking the wall. Shafer described R.R. as out of control. Shafer tried but was unable to contact respondent. After Shafer spoke with the state's attorney, R.R. was taken into protective custody and transported by ambulance to Blessing Hospital. R.R. arrived at the hospital around 12:15 p.m. Shafer continued to try to contact respondent, who eventually arrived at the hospital at 1:30 p.m. At the hospital, R.R. continued to be out of control and had to be medicated intravenously by medical staff. Initially, respondent was cooperative and willing to have R.R. hospitalized.

However, when it was determined Blessing Hospital did not have a bed for R.R. and he would need to go to Lincoln Prairie in Springfield, respondent did not want R.R. to be admitted. Respondent explained she had transportation issues because her vehicle was in the shop and she did not want R.R. to be away from home on Christmas. Shafer spoke with his supervisor, and the decision was made to take R.R. into protective custody. Shafer completed the paperwork for R.R.'s hospitalization.

¶ 11        After hearing the parties' arguments, the circuit court concluded R.R. was neglected.

¶ 12        On November 4, 2020, the circuit court held the dispositional hearing. The State's only evidence was the dispositional report, and it recommended R.R. be made a ward of the court and DCFS be granted guardianship. Respondent testified on her own behalf. On the same day as the hearing, the court entered a written dispositional order (1) finding respondent unfit and unable to care for R.R., (2) making R.R. a ward of the court, and (3) placing R.R.'s custody and guardianship with DCFS.

¶ 13        On November 6, 2020, respondent filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases govern appeals from final judgments in all proceedings under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2018)), except for delinquency cases). Thus, this court has jurisdiction of respondent's appeal under Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016). See *In re Austin W.*, 214 Ill. 2d 31, 43-44, 823 N.E.2d 572, 580 (2005), *abrogated on other grounds by In re M.M.*, 2016 IL 119932, ¶ 31, 72 N.E.3d 260 (noting "dispositional orders are generally considered 'final' for the purposes of appeal").

¶ 14                                    II. ANALYSIS

¶ 15         The Juvenile Court Act provides a two-step process the circuit court must utilize

to decide whether the minor child should become a ward of the court. *In re A.P.*, 2012 IL

113875, ¶ 18, 981 N.E.2d 336.  Step one of the process is the adjudicatory hearing, at which the

court considers only whether the minor child is abused, neglected, or dependent.  See 705 ILCS

405/2-18(1) (West 2018); *A.P.*, 2012 IL 113875, ¶ 19.  If the circuit court determines the minor

child is abused, neglected, or dependent at the adjudicatory hearing, then the court holds a

dispositional hearing, where the court determines whether it is consistent with the health, safety,

and best interests of the minor child and the public for the minor child to be made a ward of the

court.  *A.P.*, 2012 IL 113875, ¶ 21.

¶ 16         Here, respondent challenges only the first step.  The State bears the burden of

proving a neglect allegation by a preponderance of the evidence, which means it must show the

allegations are more probably true than not.  See *A.P.*, 2012 IL 113875, ¶ 17.  On review, this

court will not reverse a circuit court's neglect or abuse finding unless it is against the manifest

weight of the evidence.  See *A.P.*, 2012 IL 113875, ¶ 17.  "A finding is against the manifest

weight of the evidence only if the opposite conclusion is clearly evident."  *A.P.*, 2012 IL 113875,

¶ 17.

¶ 17         Generally, the term "neglect" is "the failure of a responsible adult to exercise the

care that circumstances demand and encompasses both unintentional and willful disregard of

parental duties."  *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 6, 976 N.E.2d 1053.  Illinois courts

have held a minor "who does not receive appropriate medical evaluations or care is neglected."

*Erin A.*, 2012 IL App (1st) 120050, ¶ 7.  Moreover, section 2-3(a)(1) of the Juvenile Court Act

(705 ILCS 405/2-3(a)(1) (West Supp. 2019)) includes in the definition of a neglected minor, a

minor "who is not receiving *** medical or other remedial care recognized under State law as necessary for a minor's well-being." Illinois law does not require a finding of medical neglect to be supported by expert medical testimony. *Erin A.*, 2012 IL App (1st) 120050, ¶ 7.

¶ 18        The evidence at the adjudicatory hearing showed R.R. had a history of oppositional defiant disorder and attention deficit/hyperactivity disorder. On December 3, 2019, respondent called the police because R.R. ran from home and she could not catch him. R.R. was out of control. The police arrived and called for an ambulance. The ambulance note indicates a police officer at the scene reported R.R. had not been taking his behavioral medications. When the emergency medical technicians entered the home, R.R. and respondent were yelling at each other. Respondent was asked to be quiet because her remarks prompted R.R. to act out more. Each time they tried to ask R.R. a question, respondent would tell them to stop asking questions and to take him away. R.R. was taken to the Blessing Hospital emergency room by ambulance for a psychiatric evaluation. The notes by the physician, a nurse, and a social worker at the hospital describe respondent as agitated, combative, and uncooperative with medical staff. Both hospital security and the police were contacted due to respondent's behavior. Respondent did not provide enough information to allow for a determination as to the "acuity of the situation" or to complete a psychological assessment. Respondent wanted to take R.R. somewhere else. Both the physician and the social worker were comfortable with that plan because respondent had given no information that indicated R.R. was in immediate danger. The social worker noted respondent was not receptive to further recommendations or discussion of resources. When Shafer met with respondent on December 4, 2019, respondent told him she was taking R.R. to Mark Twain Behavioral Health in Hannibal. Respondent was also not interested in learning about services for R.R. or what assistance DCFS could offer her. No evidence showed

respondent took R.R. somewhere else for a psychiatric assessment or treatment.

¶ 19 Seventeen days after the first incident, Shafer received a call from the resource officer at R.R.'s school, reporting R.R. as being out of control. When Shafer arrived at the school at 11:25 a.m., R.R. was in a seclusion room and attempting to get out of it by pushing past staff. Shafer observed R.R. trying to rip up papers and throw stuff. Shafer had been advised R.R. had been kicking and head butting the wall. R.R.'s foot was bleeding from kicking the wall. Shafer was unable to contact respondent and had to take protective custody of R.R. to have him transported by ambulance to Blessing Hospital. At the hospital, R.R. continued to be out of control and eventually had to be given medication to calm him. Respondent did not arrive at the hospital until 1:30 p.m. She was initially cooperative with medical staff, and hospitalization for R.R. was recommended. Respondent consented to R.R. being hospitalized at Blessing Hospital. However, Blessing Hospital did not have a bed for R.R., and he needed to go to a facility in Springfield. Respondent refused to consent to R.R.'s hospitalization in Springfield because she lacked transportation and did not want R.R. to miss Christmas. DCFS decided to take protective custody of R.R. and completed the necessary paperwork for R.R.'s admission at the facility in Springfield. No evidence was presented respondent was searching for or had an alternative facility for R.R. Respondent eventually consented to R.R.'s hospitalization at the Springfield facility after DCFS took protective custody of R.R.

¶ 20 While the evidence does not show respondent left the hospital with R.R. against medical advice after the December 3, 2019, incident, no evidence was presented respondent obtained treatment for R.R. at another facility like she told the medical staff she was going to do. She also refused to even listen to Shafer about services for R.R. R.R. then had another incident 17 days later. During the second incident, the medical staff concluded R.R. needed

hospitalization, and respondent initially refused to provide consent for the hospitalization in Springfield, which led to DCFS taking protective custody of R.R. Here, the evidence showed R.R. was not receiving the necessary medical care for his behavioral disorders when in respondent's care. Thus, the circuit court's finding of neglect was not against the manifest weight of the evidence.

¶ 21                                   III. CONCLUSION

¶ 22            For the reasons stated, we affirm the Adams County circuit court's judgment.

¶ 23            Affirmed.