2026 IL App (1st) 251395-U

No. 1-25-1395

Order filed June 12, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* Z.A., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 25 JA 84 |
| v. | ) | |
| | ) | |
| Trashonda A., | ) | Honorable |
| | ) | Kimberly M. Lewis, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

PRESIDING JUSTICE NAVARRO delivered the judgment of the court.
Justices Ocasio and Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We vacate the adjudication order finding the minor neglected where the State presented insufficient evidence to prove neglect, and in turn, we vacate the disposition and permanency orders, which were based on the neglect finding. We also remand for a new adjudicatory hearing.

¶ 2    Following an adjudicatory hearing, the circuit court found that the minor, Z.A., was neglected due to not receiving necessary medical care and that her environment was injurious to her welfare. The case proceeded to a dispositional hearing, where the court found that respondent,

Trashonda A., was unable to care for, protect, train or discipline Z.A. The court accordingly concluded it was in the best interests of Z.A. to remove her from respondent's custody and placed Z.A. with the Illinois Department of Children and Family Services (DCFS) guardianship administrator. The court also entered a permanency order finding that the appropriate goal for Z.A. was substitute care pending independence. Respondent now appeals and contends that the State failed to prove that Z.A. was neglected. For the reasons that follow, we vacate the adjudication, disposition and permanency orders, and we remand for a new adjudicatory hearing.

¶ 3                                    I. BACKGROUND

¶ 4                            A. Preliminary Proceedings

¶ 5      Respondent gave birth to Z.A. in February 2009. On January 31, 2025, the State filed a petition for the adjudication of wardship on behalf of Z.A., alleging that she was neglected due to not receiving necessary medical care, neglected due to an injurious environment and abused due to the substantial risk of physical injury. For all three theories, the State asserted that Z.A. had been diagnosed with rheumatic heart disease, which, according to unnamed medical professionals, necessitated daily blood thinner injections. The State noted that pharmacy records indicated that Z.A.'s medication had run out, if taken as prescribed. The State asserted that respondent admitted to not observing whether Z.A. took her medication, and remarked that, based on the opinions of unnamed medical professionals, the failure to take the medication as prescribed constituted medical neglect. The State also highlighted that respondent refused to cooperate with DCFS and intact family services. In an affidavit from Rosa Roman, a DCFS investigator, documenting DCFS' efforts, she noted that Z.A. also required monthly injections of penicillin and that respondent demonstrated "poor follow up [*sic*] with keep up [*sic*] medical appointments."

¶ 6    Thereafter, the circuit court appointed the Cook County Public Defender to represent respondent, and it appointed the Cook County Public Guardian as Z.A.'s attorney and guardian *ad litem*. Z.A.'s father, Zuriel A., did not appear in the proceedings and is not a party to this appeal. Following a temporary custody hearing, the court found that Z.A. should remain in the custody of respondent, but did so under an order of protection, which required respondent to communicate with DCFS about Z.A.'s medical care. However, in March 2025, Z.A.'s attorney and guardian *ad litem* filed an emergency motion to vacate the order of protection, in part, based on respondent being uncooperative with DCFS workers and preventing Z.A. from entering the family residence, which forced Z.A. to spend a weekend at a friend's residence. As a result, Z.A.'s attorney and guardian *ad litem* sought a modified temporary custody order to place Z.A. in foster care. The court found that respondent violated the order of protection and therefore vacated the order. The court, in turn, modified the temporary custody order, resulting in temporary custody of Z.A. being granted to the DCFS guardianship administrator.

¶ 7    Approximately one month before the adjudicatory hearing, the circuit court entered a case management conference order that included a witness list for the hearing. Two of the witnesses, Dr. Leslie "Javin" (whose last name is actually spelled "Jabine" based on other parts of the record) and Dr. Peter Varga, were listed as expert witnesses and both had treated Z.A. To this end, the case management conference order noted that two of the exhibits to be introduced at the hearing were copies of their *curricula vitae*.

¶ 8                                  B. Adjudicatory Hearing

¶ 9    The case proceeded to a June 2025 adjudicatory hearing, where, at the beginning of the hearing, the State sought to admit into evidence approximately 4,000 pages of Z.A.'s medical records certified from the University of Illinois Hospital and Health Sciences System (UI Health).

After neither respondent nor Z.A. objected, the circuit court allowed the medical records to be admitted into evidence. After the court admitted the medical records into evidence, without a recess, the State presented the testimony of Roman and Miguel Sandoval Garcia, investigators with DCFS. Both Roman and Garcia testified that Z.A.'s case was brought to their attention in early January 2025 for potential medical neglect as a "sequence D" case.

¶ 10    According to Roman, DCFS received a hotline call stating that Z.A. had not attended recent medical appointments and was not receiving "prescribed medication." As part of Roman's investigation, she talked to unnamed medical staff from UI Health about Z.A.'s medical history, including the "main person" who prescribed Z.A.'s "medications." Based on Roman's conversation with the unnamed prescriber, Roman learned that there was no record of Z.A.'s medication being picked up in "at least over a month" and no evidence of Z.A. "attending her medical appointments." On January 14, 2025, Roman called respondent to explain the report, but respondent told Roman she had the wrong number. Roman, however, knew the number was correct because she had talked to respondent during a previous DCFS investigation. As Roman attempted to discuss intact family services, respondent interrupted her and screamed at her. Following the investigation, Roman and her supervisor determined that the case needed judicial intervention due to the missed appointments and missed "medications."

¶ 11    During Roman's testimony, the State asked her: "[W]hat was your understanding of the medications that [Z.A.] needed to receive, and if they were crucial or if they were not?" Roman responded: "[M]y understanding was that Z.A. had to take her medications because it was a life threatening medical situation where if she weren't taking her medications as prescribed, she could—it could be fatal." Roman noted there were times that respondent cooperated with DCFS

and agreed to intact family services. But when the case worker became involved, respondent "refused to talk" and intact family services were not put in place.

¶ 12    Garcia testified that, also on January 14, 2025, he met with respondent and Z.A. in person at their residence, where respondent denied that Z.A. had been medically neglected. While there, Garcia asked to see Z.A.'s medication, and Z.A. brought him six unopened boxes and one open box of her medication, all of which had a pickup date of September 2024. According to Garcia, the medication was "enoxaparin sodium injections," which were for Z.A.'s "heart condition to prevent blood clots." In discussing the medication with Z.A., she told Garcia that she took two injections per day, one in the morning and one at night. After examining the boxes, Garcia observed that, in each box, there were ten injections, meaning one box would last five days and the six unopened boxes would last approximately a month. Based on the label on the enoxaparin, Z.A. had two refills remaining. When discussing the medication with respondent, she told Garcia that Z.A.'s doctor gave Z.A. a prescription for four to six months at a time, and while the boxes were labeled sequentially, *i.e.*, box 1, box 2, etc., Z.A. used the boxes "randomly," and not in sequence. Additionally, Garcia learned—though it is unclear from respondent or Z.A.—that Z.A. had a follow-up appointment later in January. Given these circumstances, as he left the residence, Garcia believed that Z.A. had "enough medication" remaining.

¶ 13    Following the testimony of Roman and Garcia, the State rested. Neither Z.A. nor respondent presented any evidence. Despite being listed in the case management conference order as expert witnesses, neither Dr. Varga nor Dr. Jabine testified. The case proceeded directly to closing arguments without any recess. During the State's closing argument, it contended that it proved Z.A. was neglected due to not receiving necessary medical care and an injurious

environment, and published 4 pages of the approximately 4,000 pages of Z.A.'s medical records admitted into evidence.

¶ 14    First, the State highlighted "[p]age 307," which it claimed established that Z.A. had been diagnosed with rheumatic heart disease and showed that respondent had not refilled enoxaparin in "several months." The State subsequently explained that enoxaparin was the medication name and sold under the brand name Lovenox. The State highlighted that, in the medical records, Z.A. claimed she was taking her medication as prescribed and had "extra supplies at home," but it posited that such assertions were contradicted by the pharmacy records. The State further observed that the medical records showed respondent "admitt[ing]" to not supervising Z.A.'s injections. Based on the exhibits included in the record on appeal, page 307 of the medical records is the last page of a medical record from October 14, 2024, detailing a "Procedure Pass in OCC: Pediatric Cardiology." That page contains no information about the October 14, 2024, "Procedure Pass" and is essentially a blank record. However, pages 298 and 299 of the medical records, also from October 14, 2024, but detailing "Orders Only in OCC: Pediatric Cardiology," support the State's assertions from its closing argument. Second, the State highlighted "page 255," where it stated that, as of January 14, 2025, UI Health's pediatric team and social worker discussed making a report of medical neglect. Based on the exhibits included in the record on appeal, page 255 of the medical records details Z.A.'s medication list based on a January 10, 2025, "Telephone [Call] in Social Work." However, page 246 of the medical records, from a January 14, 2025, "Telephone [Call] in Social Work," support the State's assertions from its closing argument.

¶ 15    Lastly, "to expound further," the State highlighted "page 10167 [*sic*]," where Z.A.'s pediatric cardiologist, Dr. Varga, noted "that [Z.A.] has a mechanical heart valve requiring lifelong anticoagulation therapy as stated on page 2995." The State explained that the anticoagulation

therapy helped "to prevent the artificial valve from developing blood clots which can lead to strokes or death." Based on the exhibits included in the record on appeal, there is no page 10167 in the medical records, and page 2995 of the medical records is a summary of imaging performed on Z.A.'s heart from a July 23, 2020, office visit. On page 2986 of the medical records—using the apparent pattern that the State's cited page numbers exceeded the record pagination by nine—there are clinical notes entered by Dr. Varga from a July 23, 2020, office visit, but nothing about Z.A. needing lifelong anticoagulation therapy. There is a reference to Z.A. needing "lifelong" medication, but it is on page 2581 and based on a March 10, 2021, letter written by Erin Pozzolano, a pharmacist at UI Health. In the letter, Pozzolano stated that Z.A. had:

> "a complex medical history of severe mitral regurgitation and cardiomyopathy secondary to suspected rheumatic heart disease. She has undergone a mitral valve repair on [October 3, 2019] followed by a replacement with a mechanical valve on [November 13, 2019], which has been complicated by Waring Blender syndrome. She is also required to be maintained on lifelong warfarin therapy to prevent thrombosis of her mechanical valve."

There is also a reference to Z.A. needing "life long anti-coagulation" for her "mechanical mitral valve" from progress notes of a Dr. Jaye Schreier as a result of a June 3, 2022, hospital admission on page 1158 of the medical records. As to Dr. Varga, there are over 2,000 references to him in the medical records.

¶ 16    In conjunction with highlighting four pages of Z.A.'s medical records, the State reiterated the testimony of Garcia and Roman, namely that, in mid-January 2025, there was evidence that Z.A. only had a one-month supply of enoxaparin with a last filled date of September 2024. According to the State, had Z.A. used the medication as prescribed, she would have needed to pick

up a refill every month after September 2024. In light of these facts, the State argued that Z.A. was not taking her medication as prescribed, and respondent was not supervising the injections. Lastly, the State observed that respondent refused to participate with intact family services. The State concluded that Z.A. was neglected due to not receiving necessary medical care and an injurious environment. The State presented no argument that Z.A. was abused.

¶ 17    After the State's closing argument, the circuit court ordered a "[b]rief recess" after Z.A. indicated that she wanted to speak. During that recess, Z.A.'s attorney spoke to Z.A. In Z.A.'s argument, her attorney informed the court that she wanted to express that there was no "instruction" as to what order to take her medication, and "it wasn't her mother's fault" because her doctor "gave them a lot of medication at once." Regardless, Z.A.'s attorney relayed that Z.A. claimed to "take her medication every day," claimed to have missed only one medical appointment in January 2025 and claimed that she was not medically neglected. However, Z.A.'s attorney noted that, based on his dual role as guardian *ad litem*, Z.A.'s assertions contradicted the medical records, and accordingly, he asked the court to make findings consistent with the evidence. In respondent's argument, her attorney observed that Garcia did not have any concern about a lack of medication after leaving her residence and that she "filled in the gaps for the medication by obtaining them from different pharmacies." Respondent's attorney remarked that respondent knew Z.A. could have "severe consequences" if she did not take her medication. Respondent's attorney therefore contended that Z.A. was not medically neglected.

¶ 18    Directly following the parties' arguments, the circuit court stated that it considered the testimony and "the documentary evidence by way of actual medical records that have been certified." The court observed that there was "contradictory" accounts concerning whether Z.A. took her medication as prescribed, but noted that one set of evidence was medical records,

including pharmacy records, from UI Health—evidence that had not been refuted by other medical evidence. As such, the court found "by law" it had to "prioritize" the medical records from UI Health. The court noted that Z.A. had missed appointments and had a "life-threatening condition," where follow-up appointments were "crucial for her well-being and survival." After observing that DCFS had been involved with respondent before, as the case was a sequence D matter, the court remarked that intact family services were offered to respondent, but she refused to accept them. Based on the evidence, the court found that the State met its burden to show Z.A. was neglected due to not receiving necessary medical care and an injurious environment. The court also entered a written order substantially consistent with its oral findings.

¶ 19                                  C. Dispositional Hearing

¶ 20     Following the adjudicatory hearing, the circuit court held a dispositional hearing where, following testimony and argument, it adjudged Z.A. a ward of the court based on respondent being unable for some reason other than financial circumstances alone to care for, protect, train or discipline Z.A. The court concluded it was in the best interests of Z.A. to remove her from respondent's custody, terminated its temporary custody order and ordered Z.A. placed with the DCFS guardianship administrator. For a permanency goal, Z.A.'s attorney asserted that she had a goal of independence. In turn, the court entered a permanency order for Z.A., who was 16 years old at the time, for substitute care pending independence.

¶ 21     This appeal follows. During briefing of this appeal, we granted the Cook County Public Guardian, in his capacity as both Z.A.'s attorney and guardian *ad litem*, leave to file a status report, where the Cook County Public Guardian stated that Z.A.'s permanency goal had changed from independence to returning home.

¶ 22                                      II. ANALYSIS

¶ 23                            A. Finding of Neglect

¶ 24     Respondent contends that the State failed to sufficiently prove that Z.A. was neglected because the circuit court's finding of neglect was against the manifest weight of the evidence where the evidence showed that respondent acted appropriately to Z.A.'s medical needs. Conversely, the State and Cook County Public Guardian argue that the evidence showed Z.A. had a complex medical condition and respondent was not ensuring that Z.A. received the medications to treat it, namely twice-a-day injections of enoxaparin and a monthly injection of penicillin.

¶ 25     At the adjudicatory hearing, the circuit court must determine whether the State proved that the minor is abused or neglected. 705 ILCS 405/2-18(1) (West 2024). This case only involves neglect, and there are a myriad of ways a minor can be neglected, including if she does not receive the necessary medical care for her well-being or if her environment is injurious to her welfare. *Id.* § 2-3(1)(a), (b). The term "neglect" means "the failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *In re A.P.*, 2012 IL 113875, ¶ 22. It is construed broadly and encompasses "wilful as well as unintentional disregard of duty." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). "It is not a term of fixed and measured meaning," but rather, "[i]t takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (Internal quotation marks omitted.) *Id.* The term "injurious environment" is "an amorphous concept that cannot be defined with particularity." *Id.* But generally, it means "the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *Id.* Cases involving neglect "are *sui generis*, and must be decided on the basis of their unique circumstances." *Id.*

¶ 26     During the adjudicatory hearing, the State must prove the allegations of neglect by a preponderance of the evidence. *In re V.S.*, 2025 IL 129755, ¶ 51. Stated otherwise, the State must

prove the "allegations are more probable than not." *Id.* When reviewing the circuit court's finding of neglect, we will not reverse it unless it was against the manifest weight of the evidence (*id.* ¶ 52), which occurs where "the opposite conclusion is clearly evident." *In re Z.L.*, 2021 IL 126931, ¶ 61.

¶ 27    In the instant case, the primary grounds for neglect of Z.A. for both theories—lack of necessary medical care and injurious environment—were that Z.A. did not take her enoxaparin as prescribed and missed medical appointments. In other words, the State alleged medical neglect, which also created an injurious environment. Concerning Z.A. not taking enoxaparin as prescribed, to sufficiently prove this constituted medical neglect and an injurious environment, the State, at the very least, had to establish that enoxaparin was necessary to treat Z.A.'s rheumatic heart disease and she would suffer adverse health consequences if she did not receive the medication. See *In re T.J.*, 2026 IL App (1st) 242406, ¶¶ 2, 12, 104 (finding that, in a medical neglect case where the State alleged that the minor's mother refused to give him anti-seizure medication to treat his epilepsy, "[a]t a minimum," the State had "to prove (1) that a particular medication was necessary to effectively treat [the m]inor's epilepsy and (2) that [the m]inor would suffer adverse health consequences, such as brain damage or death, if he did not receive the medication").

¶ 28    In attempting to prove these two critical propositions, the State elicited testimony from Roman that it was her "understanding" that, if Z.A. did not take the medication as prescribed, which Roman did not name during her testimony, "it could be fatal." Meanwhile, Garcia testified that it was his understanding that Z.A. took enoxaparin for "a heart condition to prevent blood clots." But the lay testimony of Roman and Garcia could not adequately prove enoxaparin was necessary to treat Z.A.'s rheumatic heart disease or she would suffer adverse health consequences if she did not take the medication. Both propositions required specialized knowledge of medicine

and were beyond the common knowledge of a lay person. See *T.J.*, 2026 IL App (1st) 242406, ¶¶ 96-97, 104. When an opinion is based on specialized knowledge, a lay witness cannot testify to such an opinion. See Ill. R. Evid. 701 (eff. Jan. 1, 2011); *People v. Heineman*, 2023 IL 127854, ¶ 75 ("A lay witness opinion must be based on the witness's personal observations and recollection of concrete facts rather than on specialized knowledge."). Instead, an expert must testify to such an opinion. See Ill. R. Evid. 702 (eff. Jan. 1, 2011); *T.J.*, 2026 IL App (1st) 242406, ¶¶ 96-97, 104. Moreover, Rule 702 "does not permit a witness to pass along an opinion from *someone else* who has such specialized knowledge." (Emphasis in original.) *T.J.*, 2026 IL App (1st) 242406, ¶ 74. That is exactly what the State attempted to do using Roman and Garcia's testimony about Z.A.'s need for enoxaparin and the consequences for her failing to take it as prescribed. The State therefore could not rely on Roman and Garcia's testimony to prove these critical propositions about Z.A. and enoxaparin.

¶ 29    The rest of the State's evidence on these propositions purportedly came from the medical records. As noted, during the adjudicatory hearing, the State introduced, and the circuit court admitted, into evidence approximately 4,000 pages of Z.A.'s medical records. During its closing argument, the State highlighted four specific pages, but none of those pages provided any support for these critical propositions. As best we can discern from our non-exhaustive review of the records, only two pages of the some 4,000 pages of medical records actually provided support for the critical propositions about Z.A. and enoxaparin. Specifically, in the medical records, there is a copy of a letter sent by Pozzolano, the pharmacist at UI Health, to respondent, where Pozzolano explained in medical terminology Z.A.'s "complex medical history." Pozzolano also noted that Z.A. had to maintain "lifelong warfarin therapy to prevent thrombosis of her mechanical valve." Additionally, there is a progress note from Dr. Schreier as a result of a June 3, 2022, hospital

admission of Z.A.'s, where there is a reference to her needing "life long anti-coagulation" for her "mechanical mitral valve." But the State cannot expect judges to decipher this medical terminology on their own. "Presumably, a qualified doctor could read most, if not all of these notes and understand them perfectly, word-for-word. But we are not qualified doctors. Judges cannot be expected to reliably translate the information contained in these medical records into concrete medical conclusions." *Id.* ¶ 115.

¶ 30     The circuit court allowed Z.A.'s medical records to be admitted into evidence under section 2-18(4)(a) of the Juvenile Court Act of 1987 (705 ILCS 405/2-18(4)(a) (West 2024)), which governs the admission of hospital records made in the regular course of business. Section 2-18(4)(a) provides:

> "Any writing, record, photograph or x-ray of any hospital ***, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event." *Id.*

While hospital records, such as Z.A.'s from UI Health, are admissible under this section, "their admissibility is limited to proving the condition, act, or event memorialized." *T.J.*, 2026 IL App (1st) 242406, ¶ 95. To this end, a hospital record could be used to prove "whether a diagnosis was made, or whether medical care took place on a certain day, or even if a particular recommendation was made as to treatment." *In re H.C.*, 2023 IL App (1st) 220881, ¶ 152.

¶ 31     Accordingly, here, Z.A.'s medical records from UI Health could be used to establish that she had been diagnosed with rheumatic heart disease, she had two heart-related surgeries, she was prescribed enoxaparin and her last refill was picked up in September 2024. But these medical

records could not establish that enoxaparin was necessary to treat Z.A.'s rheumatic heart disease or she would suffer adverse health consequences if she did not receive the medication. See *T.J.*, 2026 IL App (1st) 242406, ¶¶ 96-97, 104. "Even if we could pull such a passage from some doctor's note in the medical records, we would need to know the qualifications of that doctor to lay the appropriate foundation, and we would require testimony under oath that the doctor is rendering that opinion to a reasonable degree of medical certainty." *Id.* ¶ 97. Although it may seem axiomatic that someone could suffer serious medical consequences by not taking a prescribed medication, that did not relieve the State's burden to sufficiently establish that proposition in order to prove by a preponderance of the evidence that Z.A. suffered medical neglect.

¶ 32    Given that Z.A.'s medical records, along with Roman and Garcia's lay testimony, were insufficient to prove that enoxaparin was necessary to treat Z.A.'s rheumatic heart disease and that she would suffer adverse health consequences if not taken as prescribed, there was no competent evidence establishing them. Rather than relying on medical records and lay testimony to prove complicated medical propositions, the State needed expert testimony on such matters, as will "usually" be required in a medical neglect case. *Id.* ¶¶ 94-97, 103, 134. Previously, this court has asserted that "there is no statutory requirement or Illinois case law ruling that requires a finding of medical neglect to be supported by expert medical testimony." *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 7. Relying on *Erin A.*, such sentiment has been echoed in multiple other decisions. See *In re H.B.-H.*, 2025 IL App (1st) 242275, ¶ 74; *In re R.R.*, 2021 IL App (4th) 200563-U, ¶ 17. But, for the reasons expressed in *T.J.*, 2026 IL App (1st) 242406, ¶¶ 98-103, we disagree with such a broad statement. As explained in *T.J.*, the proper inquiry in a medical neglect case to determine whether expert testimony is warranted "is to consider the facts of each case and simply determine whether specialized knowledge is required to prove a certain proposition." *Id.* ¶ 103. "If it is, as it

usually will be in medical-neglect cases, then expert testimony is required. If not, no expert testimony is needed." *Id.* As discussed, and as is customary in medical neglect, expert testimony was required here.

¶ 33　Beyond needing an expert to prove enoxaparin was necessary to treat Z.A.'s rheumatic heart disease and that she would suffer adverse health consequences if not taken as prescribed, an expert could have discussed rheumatic heart disease. The State never presented testimony explaining what rheumatic heart disease was, how it developed and other basic information about Z.A.'s condition. Likewise, none of the medical records cited by the State during its closing argument provided an explanation. One of the State's published medical records stated that Z.A. had "rheumatic heart disease with severe mitral valve regurgitation complicated by severe Waring Blender Syndrome after initial surgical Mitral Valvuloplasty. She underwent mechanical @St Jude's mitral valve (28 mm) placement in [November 2019] with rapid *** and complete *** resolution of hemolysis subsequently." Because of the medical terminology employed, the record fails to provide a comprehensible basis for this court to understand Z.A.'s health condition. This problem illustrates the inadequacies of the State proceeding in an adjudicatory hearing without expert testimony and relying almost exclusively on medical records. In fact, it appears the State recognized that an expert was needed, as the witness list on the circuit court's case management conference order noted Dr. Jabine and Dr. Varga as expert witnesses. As discussed, however, neither Dr. Jabine nor Dr. Varga testified.

¶ 34　Although we have concluded that the medical records could not substitute for expert testimony in this case, there is another problem with relying on medical records in the manner the State did. "[W]hile the medical records themselves may be exempted from the hearsay rule, some information contained in the medical records may be hearsay itself—hearsay within hearsay, the

second level of which might be inadmissible." *Id.* ¶ 119. It is undisputed that neither Z.A. nor respondent objected to the State's introduction into evidence of Z.A.'s medical records. To this end, the State argues that respondent forfeited any challenge to their admissibility. See *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 52 (generally, a party forfeits review of a challenge to the admission of evidence by not objecting during the adjudicatory hearing). However, as pointed out in *T.J.*, 2026 IL App (1st) 242406, ¶ 120:

> "[H]ow is the defense supposed to lodge hearsay objections when over 4,600 pages are dumped in at once, without an expert (or anyone else at trial) identifying which pages are salient to the case? And if no reference is made to any specific pages at trial, as here, how is the defense lawyer supposed to know which pages the State will cite in closing argument or on appeal, when it's too late to object?"

In the instant case, the State did cite four specific pages of Z.A.'s medical records as salient. But it did so during its closing argument when the circuit court had already admitted Z.A.'s medical records into evidence at which point any objection was effectively foreclosed. See *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶ 95 (noting that "an objection must be made the first time that evidence is introduced").

¶ 35    We now turn to the State's alleged proof of neglect concerning Z.A. missing medical appointments. During Roman's testimony, she testified to learning from unnamed medical professionals at UI Health that Z.A. had missed appointments. This was the only testimony about missed appointments. Notably, Roman did not testify about the type of appointments Z.A. missed, how many were missed or anything remotely helpful to discern the significance of these missed appointments. Furthermore, the four pages of medical records cited by the State during closing arguments do not at all mention missed appointments. Page 246, or what the State cited as "page

255" during closing argument, of the medical records, where UI Health's pediatric team and social worker discussed making a report of medical neglect, does note that respondent told the social worker that "she has been taking [Z.A.] to appointments and getting her medication" after respondent learned DCFS might take Z.A. away. But even if we could infer that respondent replied in this manner because there had been an allegation of Z.A. missing appointments, again, this vague reply does not reveal what type of appointments Z.A. missed, how many were missed or anything remotely helpful to discern the significance of these missed appointments.

¶ 36    To this end, on appeal, the State and Cook County Public Guardian highlight that, based on various other medical records, Z.A. did not receive her penicillin injections in July, October or November 2024. The State also asserts these injections were "lifesaving." The medical records cited by the State and Cook County Public Guardian do demonstrate that Z.A. missed these monthly penicillin injections. But, instead of relying on the proof presented during the adjudicatory hearing, they cite to hundreds of pages of the medical records never discussed during the hearing. The State cannot rely on a substantially expanded appellate presentation of its case to cure deficiencies in the proof presented at the adjudicatory hearing.

¶ 37    It is true that we may affirm the circuit court's finding of neglect on any basis supported by the evidence (see *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 34) and all 4,000 pages of medical records were in evidence. However, this appellate principle should not apply to situations like this, where the State entered into evidence thousands of pages of medical records, highlighted only a few during the adjudicatory hearing, and then, on appeal when time allows, sifts through the 4,000 pages of medical records to find additional relevant proof. Given the circumstances of the adjudicatory hearing, the court had the opportunity to review the four pages of medical records that the State highlighted in its closing argument, either during this brief recess or some other time

during the hearing. But, it is almost impossible for the court to have reviewed the additional hundreds of pages of allegedly relevant medical records that the State uses on appeal to defend the neglect finding.

¶ 38    Nevertheless, perhaps even more fatal to the State's theory of neglect based on missing medical appointments for penicillin injections is the same issue the State had with Z.A. and enoxaparin—the lack of expert testimony. To sufficiently prove missing these appointments constituted medical neglect, the State, at the very least, had to establish that the monthly penicillin injections were necessary to treat Z.A.'s rheumatic heart condition and that she would suffer adverse health consequences if she did not receive the injections. See *T.J.*, 2026 IL App (1st) 242406, ¶¶ 2, 12, 104. The State concedes as much when, on appeal, it describes those penicillin injections as "lifesaving." Though it may seem self-evident that someone could suffer serious medical consequences by not receiving a monthly injection, that does not relieve the State's burden to sufficiently establish that proposition in order to prove by a preponderance of the evidence that Z.A. suffered medical neglect.

¶ 39    As it relates to penicillin in the medical records cited by the State during its closing argument, one of the pages states that Z.A. "reportedly is receiving her monthly PCN prophylaxis *** at Miles Square clinic *** without fail," which we can surmise means penicillin based on the context. Another portion of that same page states that Z.A. "requires Penicillin G injection 1.2 million units every 28 days until age 21 years old for rhemuatic [*sic*] heart disease." Yet none of the pages cited by the State explains why monthly penicillin injections were necessary to treat Z.A.'s rheumatic heart condition and the consequences for failing to receive the injections— propositions that could only be testified to by an expert. Given this evidentiary gap, there was no competent evidence establishing these two critical propositions necessary to conclude Z.A. was

neglected for missing medical appointments, thus leaving a critical hole in the State's case of neglect.

¶ 40    Although the State's primary grounds for medical neglect of Z.A. were that she did not take her enoxaparin as prescribed and missed medical appointments, the State also presented evidence that respondent did not supervise Z.A. taking her medication and that respondent refused to engage with intact family services. As to the supervision allegation, one of the four pages of medical records cited by the State during its closing arguments contained an admission by respondent that she did not supervise Z.A.'s injections of enoxaparin. But again, without expert testimony establishing why enoxaparin was needed to treat Z.A.'s rheumatic heart disease and the consequences for failing to take the medication as prescribed, respondent's failure to supervise is inconsequential under the circumstances of this case. As to the intact family services refusal, Roman testified to respondent's refusal to engage with such services. But evidence of a parent's failure to engage with intact family services by itself does not show a minor is neglected, as such evidence merely complements other evidence of neglect. See *In re Adam B.*, 2016 IL App (1st) 152037, ¶ 36. As such, the State presented insufficient evidence to prove that Z.A. was medically neglected, and the circuit court's finding of neglect on that basis was against the manifest weight of the evidence.

¶ 41    However, to affirm the circuit court's finding of neglect, the State only needs to sufficiently prove one ground of neglect. *In re Faith B.*, 216 Ill. 2d 1, 14 (2005). In its petition for the adjudication of wardship on behalf of Z.A. and at the adjudicatory hearing, the State relied on the same allegations supporting medical neglect to support neglect due to an injurious environment, which often is the case. See *T.J.*, 2026 IL App (1st) 242406, ¶ 12; *H.B.-H.*, 2025 IL App (1st) 242275, ¶ 3. Although we have already concluded that the State failed to sufficiently prove neglect

based on Z.A. not taking enoxaparin as prescribed and based on her missing medical appointments, the State also claims that Z.A. had been exposed to an injurious environment because respondent demonstrated an inability to cooperate with UI Health medical staff and DCFS employees.

¶ 42    During the adjudicatory hearing, Roman testified to two negative interactions respondent had with DCFS staff. Also, in one of the medical records cited by the State during its closing argument, there is a note about respondent threatening hospital staff. But neither Roman's testimony nor Z.A.'s medical records cited by the State during its closing argument show that respondent displayed a temper or made threats to Z.A. or anyone else in her household such that these instances alone could support a neglect finding based on an injurious environment. See *In re N.B.*, 191 Ill. 2d 338, 353-54 (2000) (finding that, where "the State's evidence consisted of two displays of temper [by the respondent] not directed to the children or another member of their household," it "failed to show anger of a frequency, duration or quality that would indicate that the children lived in an environment that exposed them to, or threatened them with, emotional or physical injury," thereby failing to sufficiently prove neglect due to an injurious environment). As a result, the State also presented insufficient evidence to prove that Z.A. was neglected due to an injurious environment, and the circuit court's finding of neglect on that basis was against the manifest weight of the evidence.

¶ 43    In arriving at our conclusion that the circuit court's finding of neglect on both theories—medical neglect and an injurious environment—was against the manifest weight of the evidence, we have relied significantly on *T.J.*, 2026 IL App (1st) 242406. We recognize there are some differences between the instant case and *T.J.* But regardless of those differences, the appellate court's core concern in *T.J.* was that expert testimony was required to establish certain propositions about medication necessary to sustain the State's burden to prove neglect and medical records

could not act as a substitute. *Id.* ¶¶ 93-105. In fact, *T.J.* is not the first decision to criticize the State's reliance on medical records in lieu of expert testimony, as in *H.C.*, 2023 IL App (1st) 220881, ¶¶ 148-154, the appellate court also criticized that approach, expressing "bewilderment at the way the evidence in this case was presented." The court added:

> "If our goal is to arrive at fair and accurate dispositions in cases that have serious and far-reaching consequences, expecting the judiciary to be able to decipher thousands of pages of medical evidence with no assistance understanding that evidence would seem to be folly, at best. This is not a problem for which we have no solution, either. Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) exists to facilitate the use of expert testimony when specialized knowledge will aid the trier of fact—as it would have here." *Id.* ¶ 154.

¶ 44 Additionally, *In re Z.I.*, 2026 IL App (1st) 250207, brought to our attention by the Cook County Public Guardian through a motion to cite additional authority, does not demand a different result. There, the State filed petitions for the adjudication of wardship on behalf of two minors, alleging neglect and abuse based on assertions that one of the minors suffered various injuries without plausible explanation and that hospital personnel believed the injuries were caused by physical abuse. *Id.* ¶ 7. At an adjudicatory hearing, the State presented testimony from two DCFS workers and certified medical records of both minors, including a Child Advocacy and Protective Services (CAPS) consultation note, which indicated that the physical injuries were caused by " '[c]hild physical abuse,' " which occurred more than one time. *Id.* ¶¶ 21, 27, 30-33. Following the hearing, the circuit court found both minors to be abused and neglected. *Id.* ¶ 43.

¶ 45 On appeal, the respondent-mother did not challenge the sufficiency of the evidence to prove the minors were neglected or abused, but instead challenged the circuit court's refusal to

grant multiple requested continuances and its admission of the CAPS consultation note into evidence. *Id.* ¶ 50. The appellate court found no error in the denial of the continuances or in the admission of the CAPS consultation note. *Id.* ¶¶ 54-60, 66. Although *Z.I.*, like the present case, involved findings of neglect based, in part, on medical records without accompanying expert medical testimony, it did not involve allegations of medical neglect. Moreover, the respondent in *Z.I.* challenged the CAPS consultation note, which is not at issue here, and importantly, the respondent did not challenge the sufficiency of the evidence on appeal, which is at issue here. Accordingly, *Z.I.* is distinguishable from the instant case.

¶ 46     Although we conclude that the State failed to meet its burden of proving neglect, that does not mean the allegations themselves, if supported by competent evidence, could not establish neglect. Had the State presented expert testimony about Z.A.'s need for enoxaparin and penicillin injections, and the consequences for failing to receive them as prescribed in conjunction with the evidence the State did present, the State might have sufficiently proved neglect. Indeed, the failure to adequately treat a minor's medical problems, supported by testimony from a medical professional, can demonstrate neglect. See *Erin A.*, 2012 IL App (1st) 120050, ¶¶ 2, 11-18, 30; *In re Stephen K.*, 373 Ill. App. 3d 7, 10-11, 20-22 (2007); *In re N.*, 309 Ill. App. 3d 996, 998-1000, 1008 (1999). Like in *T.J.*, 2026 IL App (1st) 242406, ¶ 132, the State appears "to have a colorable claim of neglect" in the instant case, which, in turn, dictates our remedy.

¶ 47                                B. Remedy

¶ 48     Generally, when the State fails to meet its burden to prove neglect, "the court shall order the petition dismissed and the minor discharged." 705 ILCS 405/2-21(1) (West 2024); see also *N.B.*, 191 Ill. 2d at 353-54 (concluding "that the finding of neglect was against the manifest weight of the evidence" and "order[ing] that the State's petitions for neglect be dismissed"). But, in *N.B.*,

the State did not appear to have a colorable claim of neglect. Rather, the allegations themselves were simply insufficient to support a neglect finding. See *N.B.*, 191 Ill. 2d at 347-54.

¶ 49     In the instant case, unlike in *N.B.*, the evidentiary deficiency concerns the manner of proof rather than the legal insufficiency of the allegations themselves. As we have found that the State appears to have a colorable claim of neglect, rather than reversing the finding of neglect outright and ordering the State's petition be dismissed, as in *N.B.*, we vacate the circuit court's finding of neglect and remand the matter for a new adjudicatory hearing. See *T.J.*, 2026 IL App (1st) 242406, ¶¶ 132-137 (observing that, despite the evidentiary issues at an adjudicatory hearing and the State's proof leaving the court "unable to satisfactorily complete our review for manifest error," the State "appear[ed] to have a colorable claim of neglect," resulting in the proper remedy being to vacate the finding of neglect and to remand the matter to the circuit court for a new adjudicatory hearing rather than to vacate the finding of neglect outright). As a consequence of vacating the adjudication order, we must vacate the disposition and permanency orders, which were based on the finding of neglect. See *id.* ¶ 161.

¶ 50                                III. CONCLUSION

¶ 51     For the reasons stated, we vacate the adjudicatory, dispositional and permanency orders of the circuit court of Cook County, and remand for a new adjudicatory hearing.

¶ 52     Vacated and remanded.